# EXHIBIT G

Ford Motor Co. v. Edgewood Properties, Inc., Not Reported in F.Supp.2d (2009)

RICO Bus.Disp.Guide 11,632

2009 WL 150951
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court,
D. New Jersey.

FORD MOTOR COMPANY, Plaintiff–
Counterclaim–Defendant
v.
EDGEWOOD PROPERTIES, INC., Defendant–
Counterclaimant
Edgewood Properties, Inc, Third–Party Plaintiff
v.
Ford Motor Land Development Corp,
MIG/Alberici, LLC, and EQ Northeast, Inc.,
Third–Party Defendants
Preferred Real Estate Investments, Inc. and 240
Princeton Avenue Associates, L.P., Plaintiffs
v.
Edgewood Properties, Inc., Columbia Group at
Hamilton LLC, Ford Motor Company and Ford
Motor Land Development Corporation,
Defendants
Edgewood Properties, Inc. and Columbia Group at
Hamilton LLC, Third–Party Plaintiffs
v.
MIG/Alberici, LLC and EQ Northeast, Inc., Third–
Party Defendants
MIG/Alberici, LLC, Fourth–Party Plaintiff
v.
Golder Associates, Inc. and Arcadis U.S., Fourth–
Party Defendants.

Civil Action Nos. 06–1278, 06–4266(HAA). | Jan.
20, 2009.

West KeySummary

1    Federal Civil Procedure
     ⬅Counterclaim

A company which procured concrete from an
automobile manufacturer's demolition of one of
its assembly plants could amend its
counterclaim against the manufacturer and the
company which was to test the concrete to add a
counterclaim for negligent misrepresentation as
to the quality of the concrete. The company's
proposed pleading described the various

meetings, individuals, and statements made by
the manufacturer and tester regarding the
disposition of the concrete that the company
relied on when entering into the contracts. The
company also alleged that the statements were
material, that the manufacturer and tester
breached its duty of care, that it relied on the
statements as to the quality of the concrete, and,
as a result entered into a second contract.
Company further alleged that manufacturer and
tester knew or should have known that company
would have suffered damages based on the false
information and that company did suffer
damages.

Opinion

**OPINION AND ORDER ON FORMAL MOTION**

SALAS, United States Magistrate Judge.

*1 Presently before the Court is a motion by Defendant
Edgewood Properties, Inc. ("Edgewood") for leave to file
Consolidated Amended Counterclaims, Cross–Claims and
Third–Party Claims, pursuant to Fed.R.Civ.P. 15(a). The
Court is deciding this motion without oral argument.
Fed.R.Civ.P. 78. For the reasons set forth below,
Edgewood's Motion is granted as to its claims for
negligent misrepresentation, strict liability, civil
conspiracy, and is denied as to claims for breach of
contract and contribution. Leave is hereby granted to re-
assert the NJRICO claims consistent with this opinion.

**I. FACTUAL BACKGROUND AND PROCEDURAL
HISTORY**

This action involves the removal and reuse of recycled
concrete aggregate ("concrete") which Edgewood
procured through the demolition of an automobile
assembly plant owned by Ford Motor Company ("Ford")
in Edison, NJ. In February 2004, Ford, in accordance with
the New Jersey Industrial Site Recovery Act ("ISRA"),
N.J.S.A. § 13:1K–6 *et seq.,* entered into a Remediation

Ford Motor Co. v. Edgewood Properties, Inc., Not Reported in F.Supp.2d (2009)

RICO Bus.Disp.Guide 11,632

Agreement with the New Jersey Department of Environmental Protection ("NJDEP") to facilitate the lawful deconstruction of the building. Ford contracted with MIG Alberici ("Alberici") to demolish the plant and reuse the concrete for on-site fill. (Edgewood's Proposed Pleading ¶ 23). On November 9, 2004, the NJDEP permitted Alberici to reuse the concrete for construction projects on the Ford property provided that it was free of unlawful contaminants. (Id. ¶ 25). Well into its work, Alberici discovered that they had more concrete than they estimated. (Ford's Opp. Br. at 3). As a result, Ford sought out buyers for the excess concrete. (Id. at 3–4).

On or about February 23, 2005, Ford entered into a contract with Edgewood (the "First Contract") in which Ford agreed to provide 50,000 cubic yards of concrete to Edgewood free of charge in exchange for its removal from the site. (Edgewood's Proposed Pleading, Exhibit A). Edgewood then contracted with EQ Northeast, Inc. ("EQ"), a company that Ford used during the deconstruction, wherein EQ agreed to be responsible for testing the concrete and in turn Edgewood would crush the concrete and remove the material to predominantly residential developments located primarily in southern New Jersey. (Ford's Opp. Br. at 4). Ford was not a party to the Second Contract. *Ford Motor Co. v. Edgewood Properties Inc. et al .,* No. 06–1278, 2007 WL 4526594, at *17 (D.N.J. Dec.19, 2007).

On or about June 23, 2005, Edgewood discovered that the concrete taken to the sites contained levels of polychlorinated biphenyls ("PCB") in excess of the lawful limits for either residential or commercial use. (Edgewood's Proposed Pleading ¶ 87). Edgewood complained to Ford, and Ford commenced excavation and removal of the contaminated concrete from the various properties. (Ford's Opp. Br. at 4–5).

On March 8, 2006, the NJDEP issued an administrative order ("AO") compelling Ford, Alberici and Edgewood to submit a response plan to completely excavate the sites of all contaminated material and for Edgewood to stop all construction on the contaminated properties. (Edgewood's Proposed Pleading ¶¶ 91–96). As a result, Edgewood complains that it suffered damages. (See Edgewood's Proposed Pleading generally).

*2 On March 17, 2006, Ford commenced an action against Edgewood in this Court under Sections 107(a)(4)(B) and 113(f)(3)(b) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. § 9601 *et seq.* ("CERCLA") and Section 58:10–23, 11f (a)(2) of the Spill Act ("Spill Act" or "Act") for contribution and

indemnification for all costs as provided under the First Contract. (See Complaint generally). Ford included common law claims of breach of contract, unjust enrichment, indemnification, fraud and negligence. (Id.). On December 7, 2006, Edgewood filed an Answer and Counterclaim against Ford and third-party claims against Ford Land Development Corp. ("Ford Land"), Alberici and EQ under various legal theories, including but not limited to, breach of contract, contribution, negligent misrepresentation, and civil conspiracy.

Subsequent to the filing of the Newark action, 240 Princeton Avenue Associates ("Princeton"), owner of one of the contaminated properties, American Standard, filed a complaint in Trenton against Edgewood and Columbia Group at Hamilton, LLC ("Columbia"). On September 15, 2006, Preferred Real Estate Investments, Inc. joined Princeton in their complaint and added Ford and Ford Land as Defendants and additional claims against Ford and Edgewood for contamination to the American Standard property. Edgewood and Columbia in turn filed cross-claims against Ford and Ford Land and third-party claims against Alberici and EQ for concrete used at the properties.

On February 22, 2007, this Court consolidated the Trenton Action with the Newark Action under the Newark docket number. Subsequently, Princeton and Edgewood entered into a stipulation of dismissal which was entered with prejudice on July 25, 2007, leaving Ford's action against Edgewood pending. Edgewood's motion for leave to amend its counterclaims, cross-claims, and third-party claims are addressed by the Court in this opinion.

## II. DISCUSSION

In deciding a motion to amend, the "court applies the same standard of legal sufficiency as exists under Rule 12(b)(6)." *Shane v. Fauver,* 213 F.3d 113, 115 (3d Cir.2000). The court must "accept as true all allegations in the complaint and all reasonable inferences that can be drawn there from and view them in the light most favorable to the plaintiff." *Kanter v. Barella,* 489 F.3d 170, 177 (3d Cir.2007) (quoting *Evancho v. Fisher,* 423 F.3d 347, 350 (3d Cir.2005)).

A motion for leave to amend a complaint shall be freely given when justice so requires. *Forman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); Fed. R.Civ. P. 15. Although leave to amend the pleadings under Fed.R.Civ.P. 15 is granted liberally, the court may deny a

Ford Motor Co. v. Edgewood Properties, Inc., Not Reported in F.Supp.2d (2009)

RICO Bus.Disp.Guide 11,632

motion to amend where there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of the amendment." *Id.* Finally, the decision whether to grant or deny a motion for leave to amend rests "within the discretion of the District Court." *Id.*

**\*3** " 'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted.' " *In re Burlington Coat Factory Securities Litig.,* 114 F.3d 1410, 1434 (3d Cir.1997) (quoting *Glassman v. Computervision Corp.,* 90 F.3d 617, 623 (1st Cir.1996). As noted above, to determine whether a proposed amendment is futile the Court applies the same standard as a motion to dismiss under Rule 12(b)(6). *Medpointe Healthcare, Inc. v. Hi–Tech Pharmacal Co., Inc.,* 380 F.Supp.2d 457, 462 (D.N.J.2005).

In *Bell Atlantic Corp. v. Twombly,* the U.S. Supreme Court addressed the pleading requirements of Rule 8(a)(2) in the context of a motion to dismiss under Rule 12(b)(6). 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The Supreme Court stated that a complaint does not have to include detailed factual allegations but "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 1964–65. Thus, the Court stated that the threshold requirement of Rule 8(a) (2) is "that the 'plain statement' possess enough heft to 'show that the pleader is entitled to [that] relief.' " *Id.* at 1966. Expounding on *Twombly,* the Third Circuit stated that "[w]hile Rule 12(b)(6) does not permit dismissal of a well-pleaded complaint simply because 'it strikes a savvy judge that actual proof of those facts is improbable,' the '[f]actual allegations must be enough to raise a right to relief above the speculative level.' " *Phillips v. County of Allegheny,* 515 F.3d 224, 234 (3d Cir.2008) (quoting *Twombly,* 127 S.Ct. at 1965).

### III. ANALYSIS

Edgewood seeks to insert additional claims for negligent misrepresentation, strict liability, common law conspiracy and violation of the New Jersey Racketeer Influenced and Corrupt Organizations Act ("NJRICO"). Edgewood also seeks to reassert claims for breach of contract, which were dismissed by the Honorable Harold A. Ackerman, U.S.D.J., on a prior motion to dismiss. *Ford Motor Co.* 2007 WL 4526594 at \*17. The Court will turn to each of

the proposed amendments.

**A. Breach of Express Warrant and Contractual Indemnification against Ford and Ford Land under the Second Contract**
Edgewood for a second time alleges that Ford breached its contractual duties under the Second Contract. On a motion to dismiss, Judge Ackerman ruled that Edgewood did not sufficiently plead mutual assent to the Second Contract. *Id.* Judge Ackerman explicitly stated: "Plainly, Edgewood cannot allege that Ford or Ford Land breached the terms of a document that do not set out any obligations for Ford or Ford Land to breach." *Id.* at 52. Yet, Edgewood sees Judge Ackerman's order as allowing it to reassert this allegation because such permission was "implicit in the Court's ruling, which did not dismiss Edgewood's claims with prejudice." *Id.* at n19.

**\*4** Edgewood now claims that it cured the "defects" of its prior claims of breach of contract in accordance with Judge Ackerman's ruling by pleading with particularity that: (1) Ford mutually assented to the Second Contract; (2) Ford directed EQ to negotiate and execute the Second Contract with Edgewood and agreed to be a signatory to the Second Contract; (3) Ford performed obligations contemplated thereunder and agreed to by the parties; (4) Ford agreed to undertake certain obligations pursuant to the contract; and, (5) Ford conducted itself as if the Second Contract was legally effective and binding. Edgewood further argues that the Second Contract was not fully integrated and, therefore, extrinsic evidence of the aforementioned allegations should be permitted under New Jersey law. Edgewood's Reply Br. at n. 20. Finally, Edgewood contends that if this Court does not find that the Second Contract is binding upon Ford, it should find that Edgewood has sufficiently pleaded the existence of an oral contract with Ford.[1] *Id.* at 46.

Ford in its opposition brief argues that Edgewood's amended claims involving the Second Contract are futile and have already been considered and rejected by Judge Ackerman. Ford's Opp. Br. at 7. Ford contends that: (1) there was no "mutual assent" of the Second Contract since, as Judge Ackerman ruled, Ford was not a signatory; and, (2) that the Second Contract was fully integrated by virtue of a merger clause. *Id.* at 8–10.

A plaintiff alleging breach of contract must establish: (1) the existence of a valid contract between plaintiff and defendant; (2) that defendant breached the contract; (3) that Plaintiff performed his or her obligations under the contract; and (4) resulting damages. *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.,* 275 F.Supp.2d 543,

566 (D.N.J.2003), *aff'd,* 342 F.3d 191 (3d Cir.2003). A plaintiff cannot meet the burden of establishing these elements by merely making conclusory allegations. *In re Nice Sys., Ltd. Secs. Litig.,* 135 F.Supp.2d 551, 565 (D.N.J.2001). Rather, under New Jersey law, a contract is only enforceable if it is "sufficiently definite in its terms that the performance to be rendered by each party can be reasonably ascertained." *Savarese v. Pyrene Mfg. Co.,* 9 N.J. 595, 599, 89 A.2d 237 (1952). It is conceivable for a court to rule that a complainant cannot allege mutual assent where "[p]laintiff fails to establish that [the defendant] was a party to a valid contract with [p]laintiff." *Overseas Food Trading Ltd. v. Agro Acietunera S.A.,* No. 06–800, 2006 WL 2482580, at *2 (D.N.J. Aug.28, 2006). It is apparent that mutual assent is lacking where: "[The defendant's] name, address, or signature do not appear on the [contract], and further where [the defendant has no discernable duties or obligations under the [contract]. Thus, it is unclear what the defendant] assented to do." *Id.*

After careful review of Edgewood's Proposed Pleading, this Court finds no reason to give Edgewood another bite at the apple. Judge Ackerman ruled that mutual assent was lacking because the Second Contract did not mention Ford or Ford Land on the document, they did not sign the Second Contract, and the contract does not set forth any obligations for Ford or Ford Land to breach. *Ford Motor Co.,* 2007 WL 4526594 at *17. Edgewood's new conclusory allegations do not change the situation at hand. Edgewood is attempting to hold Ford and Ford Land hostage to a contract that they did not sign and does not set forth any obligations for them to perform. Conclusory statements that Ford and Ford Land mutually assented to the contract are insufficient to hold them liable. *See Overseas Food Trading, Ltd.,* 2006 WL 2482580 at *3. Edgewood's assertion that Ford and Ford Land mutually assented to the Second Contract is contradicted by the contract itself which does not does not include them nor set forth any obligations for them to perform.

*5 Judge Ackerman has already reviewed the second contract and has determined that it does not bind Ford or Ford Land. The contract does not mention Ford and only mentions Ford Land in the indemnification clause. Edgewood's new allegations are nothing more than bald assertions that do not contain any new factual information. Therefore, Edgewood's cannot survive a motion to dismiss because they are contradicted by the Second Contract. Accordingly, Edgewood's motion to amend Count I and V of the consolidated complaint is denied.

**B. Strict liability against Ford**
Ford urges this Court to deny leave to amend the strict liability claim for futility, because Edgewood assumed a risk in accepting and handling recycled concrete. (Ford's Opp. Br. at 26). In support of its position, Ford submits that Edgewood's pleadings "undermine" its claim because it admitted, particularly, in Consolidated Claim ¶ 71 "that it contracted with EQ to crush and reuse concrete containing contaminants up to commercial levels ... [and that it agreed] to obtain contaminated concrete, transport contaminated concrete, and use contaminated concrete." (*Id.* at 27). Thus, Ford argues, Edgewood knowingly contracted with others to obtain and use ultra-hazardous material and should therefore bear the risk. *Id.* Edgewood contends that Ford's argument fails for two reasons: (1) that Edgewood understood that the concrete was approved by the NJDEP; and (2) that "assumption of the risk" is a defense and not proper grounds for this Court to deny leave to amend. (Edgewood's Reply Br. at 49). This Court agrees.

Ford fails to provide this Court with case law where a complaintant was barred from asserting a strict liability claim based on the fact that the defendant had a possible, provable "assumption of the risk" defense. Further, the paragraphs that Ford highlights indicate that Edgewood also expected to receive concrete which was "free of contamination." (Edgewood's Proposed Pleadings ¶ 71). It is apparent, then, that Edgewood may have agreed to take concrete with some contamination levels, but it also expected to take concrete "free of contamination." The Court finds that such an allegation is not speculative, since it is common sense that a reasonable buyer would expect to receive usable concrete. *Phillips,* 515 F.3d at 234. Moreover, Edgewood does not have to prove the allegations at this point. *Foundation Credit Funds, LLC,* 2006 WL 3780677, at *1. It merely has to state enough facts to make the complaint plausible. *Twombly,* 127 S.Ct. at 1965. Granting Edgewood leave to amend this claim does not prejudice Ford since it can raise the affirmative defense of assumption of the risk at a later point, and then seek leave to file its motion for summary judgment if discovery vindicates Ford.

The Court finds that Edgewood has alleged enough facts to conclude that discovery may prove the "necessary element," which could be in this case that Ford is strictly liable, or perhaps that Edgewood assumed a risk. *Phillips,* 515 F.3d at 234.[2] Therefore, this Court finds that Edgewood has sufficiently plead with particularity a claim for strict liability and leave to amend Count VIII is granted.

Ford Motor Co. v. Edgewood Properties, Inc., Not Reported in F.Supp.2d (2009)

RICO Bus.Disp.Guide 11,632

## C. Negligent Misrepresentation against Ford and EQ

*6 Both Ford and EQ contend that Edgewood's negligent misrepresentation claims should be denied for futility purposes.[3] Ford argues that Edgewood's claim is futile as the claim is contradicted by the documents and pleadings. (Ford's Opp. Br. at 23–24). Specifically, Ford argues that Edgewood was aware that it would receive concrete in excess of residential standards. (*Id.*). Edgewood counters that it properly pleaded that Ford made representations that Edgewood would receive concrete which "was properly tested and ... not exceed[ing] [residential] criteria." (Edgewood's Consolidated Reply Br. at 35). EQ argues that Edgewood has failed to claim that Edgewood received or relied on any factual information or that EQ made any misrepresentations to Edgewood. (EQ Opp. Br. at 29–31). On the other hand, Edgewood argues that its Proposed Pleading alleges that Edgewood did receive misrepresentations from EQ and that Edgewood relied on the misrepresentations. (Edgewood's Consolidated Reply Br. at 39–40).

Negligent misrepresentation "requires a showing that defendant negligently provided false information and that the plaintiff incurred damages proximately caused by its reliance on that information." *Highlands Ins. Co. v. Hobbs Group,* 373 F.3d 347, 351 (3d Cir.2004). "The common law tort of negligent misrepresentation shares all the components of fraud, but includes one additional factor: the misrepresentation must be made by a person with a duty to the plaintiff." *In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 975 F.Supp. 584, 619 (D.N.J.1996), *rev'd on other grounds,* 133 F.3d 225 (3d Cir.), *cert. denied,* 525 U.S. 817, 119 S.Ct. 55, 142 L.Ed.2d 43 (1998). *See also Kronfeld v. First Jersey Nat. Bank,* 638 F.Supp. 1454, 1467 (D.N.J.1986) (holding that while "a fiduciary duty between the parties is [not] an element of a claim for negligent misrepresentation," a plaintiff seeking to recover for negligent misrepresentation must plead that the defendant owed it a duty of care). Therefore, Edgewood must include in their pleadings factual allegations to substantiate that: (1) Ford and EQ made representations to Edgewood that were false; (2) the statements were material; (3) Ford and EQ owed a duty to Edgewood; (4) Ford and EQ knew or should have known that those statements were false; (5) Edgewood relied on Ford and EQ's misrepresentations; and, (6) Edgewood suffered damages as a result of their reliance. *Kaufman,* 165 N.J. at 107, 754 A.2d 1188.

Edgewood's proposed amendments for negligent misrepresentation would withstand a motion to dismiss under Rule 12(b)(6) and, therefore, this Court finds that the amendments survive the futility test as Edgewood has sufficiently pleaded the elements of negligent

misrepresentation against Ford and EQ. Paragraphs 44–59 of Edgewood's Proposed Pleading describe the various meetings, individuals, and statements made by Ford and EQ to Edgewood regarding the disposition of the concrete that Edgewood relied on when entering into the contracts. Edgewood also alleges that these statements were material; that Ford and EQ breached its duty of care; that Edgewood relied on the statements made by Ford and EQ as to the quality of the concrete, and as a result entered into the Second Contract with EQ; that Ford and EQ knew or should have known based on those meetings that Edgewood would have suffered damages based on the false information; and that Edgewood did in fact suffer damages as a result of its reliance on said statements.[4] (Edgewood's Proposed Pleading, ¶¶ 194–202, 204–206, 326–338). Edgewood's allegations sufficiently put EQ and Ford on notice of the claims asserted against them.

*7 Therefore based on the foregoing, this Court finds that Edgewood has sufficiently pleaded a claim for negligent misrepresentation, and leave to amend this claim is hereby granted. However, leave to amend is denied with respect to paragraph 203 since it references the Second Contract, and this Court has ruled above that Ford has no obligations under the Second Contract.

## D. Contribution under the Spill Act

Edgewood moves the Court for permission to include contribution claims against Ford under the Spill Act. On or about January 3, 2008, the NJDEP issued an Administrative Consent Order ("ACO") expressly providing that the Order "constitutes an administrative settlement within the meaning of N.J.S.A. 58:10–23.11f(a)(2)(b)." (Ford Opp. Br. at 25). Edgewood contends that their contribution claim should be allowed, because the NJDEP never notified Edgewood of the proposed ACO in violation of N.J.S.A. 58:10–23.11e2.[5] Since it was denied an opportunity to participate in the comment process, Edgewood argues that the ACO is "executory" and not final. (Edgewood Consolidated Reply Br. at 48–9). As a result, Edgewood concludes that Ford has no claim for contribution, yet believes that it should be allowed to claim contribution against Ford under the same Act. (*Id.* at 48, 754 A.2d 1188).

Ford argues that it resolved its liability to the State of New Jersey under the Spill Act by paying a $250,000 fine to the NJDEP and a $50,000 fine to the Town of Edison. (Ford's Opp. Br. at 25). Ford further contends that under the ACO, the NJDEP declared that Ford's obligations have been concluded. (*Id.* at 25, 754 A.2d 1188). As a result, Edgewood's claims for contribution are futile, since the ACO is a final declaration on Ford's obligations,

Ford Motor Co. v. Edgewood Properties, Inc., Not Reported in F.Supp.2d (2009)

RICO Bus.Disp.Guide 11,632

and therefore, protects Ford from any contribution claims by Edgewood. (*Id.*). This Court agrees.

Under N.J.S.A. § 58:10–23.11f(a)(2)(a), whenever a person removes hazardous substance, that person can have a claim for contribution against anyone who may be liable for the cost of the clean up.[6] Moreover, N.J.S.A. § 58:10–23.11f(a)(2)(b) provides that any person who has resolved their liability with the NJDEP and has either received a no action letter or "entered into an administrative or judicially approved settlement with the State, shall not be liable for claims for contribution."[7]

Courts in this District have reasoned that the Spill Act contemplates several liability in order for a contribution claim to stand. N.J.S.A. 58:10–23f(a)(2) "reads much more closely to section 113(f) of CERCLA, by providing a right of contribution and authorizing the courts to equitably allocate the costs of cleanup and removal among the parties." *SC Holdings, Inc. v. A.A.A. Realty Co.,* No. 95–0947, 1996 U.S. Dist. LEXIS 12428, at *29 (D.N.J. Aug. 19, 1996). "Because rights of contribution in this case are analogous under CERCLA and the Spill Act and because [the third-party plaintiff] will not be liable for an amount in excess of its pro-rata share of harm ... it cannot seek contribution from Third–Party Defendants under the Spill Act." *Reichhold, Inc. v. United States Metals Refining Co.,* No. 03–453, 2004 WL 3312831, at *7 (D.N.J. Oct.27, 2004). Furthermore, Judge Ackerman in a detailed analysis of the above ruled: "While the Spill Act supports contribution for Ford against Edgewood, the Spill Act does not contemplate liability against Edgewood beyond Edgewood's own fair share." *Ford Motor Co.,* 2007 WL 4526594 at * 20.

**\*8** In support of their claim, Edgewood attaches a letter from Gary W. Wolf, II, Deputy Attorney General of the State of New Jersey, to John McGahren, Esq. of Patton Boggs, LLP, counsel for Ford. (Edgewood's Consolidated Reply Br. Ex. A). The letter informed the parties that the NJDEP agreed to extend the opening for public comment from April 21, 2008 until May 21, 2008. (*Id.*). The letter says in part that the NJDEP will "consider all comments received, and *may* decide to *withdraw* or withhold consent to the ACO if the comments received disclose facts or considerations which show that the ACO is inappropriate, improper or inadequate. If no such comments are received, the ACO will become effective on May 21, 2008, when the comment period closes." (*Id.*). Edgewood reads this language along with the thirty-day notice provision under N.J.S.A. 58:10–23.11f(a)(2)(b) to mean that the "ACO is not final." (Edgewood's Consolidated Reply Br. at 48).

Neither the language of the statute nor the contents of the letter indicate to this Court that Ford is stripped of its right to plead a claim for contribution under the Spill Act. The NJDEP stated in the letter that it "may decide to withdraw," which would indicate to a reasonable person that the ACO *remains in effect* until such time the NJDEP determines that the ACO is inadequate. But regardless of whether the ACO was executory or final is not a matter for the Court to decide at this juncture. The question is whether Edgewood can claim contribution under the Spill Act and this Court finds that it cannot.

Ford has sufficiently pleaded that it incurred losses in complying with the ACO. The language of the N.J.S.A. § 58:10–23.11f(a)(2)(a) is apparent: "In resolving contribution claims, a court may allocate the costs of cleanup and removal among liable parties using such equitable factors as the court determines are appropriate." Since Ford and Ford Land pleaded that they collectively settled their liability with the NJDEP, First Amended Complaint, at ¶ 82, Ford has a right under the Spill Act to claim contribution against any other potentially liable party. Conversely, as Judge Ackerman ruled, Edgewood does not have the same right to contribution under the statute, since the statute only contemplates several liability. *Ford Motor Co.,* 2007 U.S. Dist. LEXIS 20. Edgewood cites no case law to the contrary. Therefore, the Court finds that Edgewood's proposed amended claim for contribution would not withstand a motion to dismiss. Leave to amend as to this claim is denied.

**E. Civil Conspiracy**

EQ and Alberici urge the Court to deny Edgewood leave to amend its pleadings so it may include a claim of civil conspiracy. EQ bases its argument on the same reasoning it did above: "Edgewood does not claim that EQ conspired [alone]; Edgewood claims that only "Ford, Alberici, EQ, J & L, Golder and/or Arcadis" conspired." (EQ Opp Br. at 27). Alberici's arguments, however, are even more tenuous. Alberici claims that Edgewood "cannot show" that they "conspired with anyone to do anything to Edgewood," and that it had "absolutely nothing to do with either the First or Second Contracts, or the Golder memorandum in which Edgewood allegedly relied." (*Id.*) at 12. Edgewood contends that EQ and Alberici's arguments are premature at this stage of litigation. (EQ Opp. Br. at 33). This Court agrees.

**\*9** Under New Jersey law, a civil conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, a principal element of which is to inflict a wrong against or injury upon another, and an overt act

Ford Motor Co. v. Edgewood Properties, Inc., Not Reported in F.Supp.2d (2009)

RICO Bus.Disp.Guide 11,632

that results in damage." *Banco Popular N. Am. v. Gandi,* 184 N.J. 161, 177, 876 A.2d 253 (2005). "To establish a conspiracy, it simply must be shown that there was a single plan, the essential nature and general scope of which [was] known to each person which is to be held responsible for its consequences." *Morgan v. Union Co. Bd. of Chosen Freeholders,* 268 N.J.Super. 337, 364, 633 A.2d 985 (App.Div.1993). The heart of the claim is not the unlawful agreement, but the wrong which lies beneath the surface of the conspiracy. *Id.* Furthermore, a civil conspiracy can be inferred from circumstantial evidence as direct evidence of a civil conspiracy can rarely be shown. *Id.* at 365, 633 A.2d 985; *Kronfeld,* 638 F.Supp. at 1468–69 (holding that "a conspiracy often is established by inferences from circumstantial evidence."). However, "[s]pecific facts of an agreement must be alleged," conclusory statements will not suffice. *Id..*

Courts in this District have held that such claims must be pleaded with specificity under F.R. Civ. P. 9(b). *Kronfeld,* 638 F.Supp. at 1468. A plaintiff is also "required to identify the source of the allegedly fraudulent misrepresentation or omission at issue." *Granite State Ins. Co. v. UJEX, Inc.,* Docket No. 03–1220, 2005 U.S. Dist. LEXIS 13692, at *24–25, 2005 WL 1618792 (D.N.J. July 11, 2005), (citing *Klein v. Gen. Nutrition Cos., Inc.,* 186 F.3d 338, 345 (3d Cir.1999)). "Fed.R.Civ.P. 9(b) requires, at a minimum, that the plaintiff identify the speaker of allegedly fraudulent statements."). "Not every conspirator must commit an overt act in furtherance of the conspiracy, so long as at least one does." *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.,* 331 F.3d 406, 415 (3d Cir.2003).

Alberici erroneously contends that Edgewood must "show" a conspiracy at this stage in the litigation. As held throughout this Opinion, Edgewood does not have to prove its case at this point. Rule 8(a)(2) requires only a "showing" that the claimant is entitled to relief—not a "showing" of evidence. Thus, this Court finds that Edgewood properly alleged all the elements of civil conspiracy with specificity. *Adams,* 1989 U.S. Dist. LEXIS 4205, at *17.

Edgewood alleges that Ford, Alberici, EQ and others combined to commit a fraud to induce them to enter into contracts while knowing that the concrete was contaminated. Edgewood further alleges that Ford, Alberici, EQ, and others "agreed" to "handle, test and/or distribute contaminated concrete to Edgewood" and references the "speakers" of the alleged fraud. ¶ 344 (incorporating paragraphs 111–133; 141–158, describing conversations between various representatives).

Moreover, this Court finds that Edgewood has alleged "overt acts" committed by the conspirators. In particular, Edgewood alleges that in or around January 2005, Ford, Alberici, and J & L began distributing concrete with positive PCB detections ... in an effort to avoid spending millions of dollars in costs to transport and properly dispose of the concrete in an authorized landfill. (Consolidated Amended Claims, ¶ 43). Edgewood further claims that representatives and/or agents of Ford, Alberici, and J & L, including Marty Huffman, discussed providing Edgewood with concrete from the Edison plant which met RDCSCC criteria. (*Id.* at ¶ 45). Additionally, Edgewood declares that under the First Contract, Ford, Alberici, EQ, and J & L oversaw and/or were responsible for crushing, stockpiling, testing, and designating which piles of concrete were to be loaded onto Edgewood's trucks. (*Id.* at ¶ 53). At this stage of the litigation, none of the aforementioned "overt acts" require direct proof. *Kronfeld,* 638 F.Supp. at 1468; *Morgan,* 268 N.J.Super. at 365, 633 A.2d 985. Therefore, this Court finds that Edgewood has properly pleaded a claim for civil conspiracy and leave to amend is hereby granted.

### F. NJRICO

**\*10** Finally, Edgewood seeks leave of this Court to include conspiracy claims under NJRICO. NJRICO provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in or activities of which affect trade or commerce to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activities or a collection of unlawful debt.

N.J.S.A. 2C:41–2(c). It is important to note that NJRICO is broader in scope than the federal RICO statute. *State v. Ball,* 268 N.J.Super. 72, 104, 632 A.2d 1222 (App.Div.1993) *aff'd,* 141 N.J. 142, 661 A.2d 251 (1995). The New Jersey courts take a liberal stance in permitting plaintiffs to plead NJRICO violations, rejecting the narrow construction of the federal statute that many circuits, including this one, have adopted. *Id.* at 103–104, 632 A.2d 1222.

In addition, pursuant to N.J.S.A. 2C:41–2c, a plaintiff must prove the following five elements: "(1) the existence of an enterprise; (2) that the enterprise engaged in or its activities affected trade or commerce; (3) that defendant

Ford Motor Co. v. Edgewood Properties, Inc., Not Reported in F.Supp.2d (2009)

RICO Bus.Disp.Guide 11,632

was employed by, or associated with the enterprise; (4) that he or she participated in the conduct of the affairs of the enterprise; and (5) that he or she participated through a pattern of racketeering activity." Since the NJRICO statute is predicated upon its federal cousin, Title IX of the Federal Organized Crime Control Act of 1970, 18 U.S.C.A. §§ 1961–1968, courts should seek guidance from those decisions. (*Id.* at 98, 632 A.2d 1222).

Finally, there must be an injury to plaintiffs as a result of the conspiracy. *Shan Indus.,* 2005 U.S. Dist. LEXIS. at* 47; *see also, First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 769 (2d Cir.), *cert. denied,* 513 U.S. 1079, 115 S.Ct. 728, 130 L.Ed.2d 632 (1995) (quoting *Standardbred Owners Ass'n v. Roosevelt Raceway Assocs. L.P.,* 985 F.2d 102, 104 (2d Cir.1993)) ("[t]o show that an injury resulted "by reason of" the defendant's action, and therefore to have standing under [civil] RICO, the plaintiff must allege "that the defendant's violations were a proximate cause of the plaintiff's injury, i.e., that there was a direct relationship between the plaintiff's injury and the defendant's injurious conduct.") "This language can, of course, be read to mean that a plaintiff is injured 'by reason of' a RICO violation, and therefore may recover, simply on showing that the defendant violated § 1962, the plaintiff was injured, and the defendant's violation was a 'but for' cause of plaintiff's injury." *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 265, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992).

**1. Edgewood's Consolidated Amended Claims Properly Pleaded the Existence of an "Enterprise" Within the Meaning of N.J.S.A. 2C:41–1.**
As discussed above, the New Jersey courts have construed NJRICO more broadly than its federal counterpart. *Ball,* 268 N.J.Super. at 107, 632 A.2d 1222. Under the federal RICO statute, a plaintiff cannot name an enterprise as a defendant. *Glessner v. Kenny,* 952 F.2d 702, 711–12 (3d Cir.1991); *Brittingham v. Mobil Corp.,* 943 F.2d 297, 300–03 (3d Cir.1991). This became known as the *Enright* rule.[8] which was established to prevent the "persons" who make up the enterprise, from using the "enterprise" as a pass through to "extract money from third parties." *Petro–Tech, Inc. v. Western Co. of North America,* 824 F.2d 1349, 1359 (3d Cir.1987).

**\*11** In stark contrast, the New Jersey courts have determined that NJRICO departs from its federal counterpart in defining "enterprise ." Under N.J.S.A. 2C:41–1b, a " 'person' includes any individual, entity, or enterprise as defined [t]herein holding or capable of holding a legal or beneficial interest in property."

Likewise, under N.J.S.A. 2C:41–1c: " 'Enterprise' includes any individual, sole proprietorship, partnership, corporation, business or charitable trust, association, or other legal entity, any union or group of individuals associated in fact, although not a legal entity, and it includes illicit as well as licit enterprises and governmental as well as other entities." The New Jersey courts have reasoned that since a "broader definition of 'person' eliminates the Enright distinctiveness rule for an action under New Jersey RICO," a plaintiff may name the enterprise and the various individuals who constitute that enterprise within the same count. *Ball,* 268 N.J.Super. at 107, 632 A.2d 1222; *Maxim Sewerage Corp.,* 273 N.J.Super. at 95, 640 A.2d 1216.

In this District, New Jersey's broad interpretation of "enterprise" has been applied in deciding a motion for leave to amend. *Shan Indus., LLC,* 2005 U.S. Dist. LEXIS 37983 at, * 48. Under NJRICO, an enterprise may be pleaded as "no more than the sum of the racketeering acts," and that an "enterprise may also be identified by the existence of an ascertainable structure, such as that which exists within a corporation, or by an informal organization which demonstrates a division of labor among individuals." *Id.* at 49. N.J. Stat. Ann. 2C:41–2(c) contemplates that a person is associated with an enterprise if they have "a position or functional connection with the enterprise that enables him or her to engage or participate directly or indirectly in the affairs of the enterprise." *State v. Ball,* 141 N.J. 142, 175, 661 A.2d 251 (1995).

Here, Edgewood has properly pleaded that Ford, EQ, Alberici, J & L, Golder and Arcadis formed an enterprise. Edgewood claims that these entities formed an enterprise with the intent to engage in trade or commerce via distributing contaminated concrete in violation of environmental regulations. (Consolidated Amended Claims, at ¶¶ 219, 234, 240, 241). In its Amended Pleading, Edgewood further alleges that, under the third NJRICO element, the group was "associated in-fact," in a principle-agent and contractor-sub-contractor relationship, and described the "functional connection" of each member. (*Id.* at ¶¶ 224–235, 661 A.2d 251).

According to Edgewood, Ford owned and controlled the concrete located at the Edison plant, and determined how the concrete would be disposed of. (*Id.* at ¶ 227, 228, 661 A.2d 251). Moreover, Edgewood asserts that Alberici assumed a managerial role on behalf of the enterprise, to wit: (1) Alberici served as general contractor assigned to decommission the Ford plant; (*Id.* at ¶ 20, 661 A.2d 251); (2) Ford and Alberici received permission from the NJDEP to reuse concrete as backfill on the Ford site provided there were no detections of PCBs; (*Id.* at ¶ 26,

Ford Motor Co. v. Edgewood Properties, Inc., Not Reported in F.Supp.2d (2009)

RICO Bus.Disp.Guide 11,632

27, 661 A.2d 251); (3) Ford and Alberici failed to receive proper approvals to distribute concrete to redistribute concrete offsite; (*Id.* at ¶ 29, 661 A.2d 251); Edgewood was provided with a memorandum "reinforc[ing] the representation [Alberici] had made to Edgewood—that Edgewood received and would continue to receive, concrete with PCB concentrations below the unrestricted use cleanup criteria." (*Id.* at ¶ 65, 661 A.2d 251). Further, Edgewood alleged that EQ was hired to dispose of waste streams emitted from the Edison plant, and as a result, had authority to direct the disposal of the concrete. (*Id.* at 229, 661 A.2d 251).

**\*12** As the court in Shan noted, "At this stage in the litigation, the Court need not engage in extensive analysis of this element, since on a motion to amend, provided that there is some version of the facts which will support the existence of a claim, this Court will allow the plaintiff to amend its Complaint and have its day in court." *Shan Indus., LLC,* 2005 U.S. Dist. LEXIS 37983, \*50. At a minimum, Edgewood asserted the existence of an enterprise consisting of Ford, Alberici, EQ, J & L, Golder and Arcadis, and that they engaged in commerce. Therefore, this Court finds that the first two NJRICO elements are satisfied. Further, this court finds that Edgewood has satisfied the "associated with the enterprise" requirement and has sufficiently pleaded that he or she participated in the conduct of the affairs of the enterprise.

**2. Edgewood's Consolidated Amended Claims Properly Pleaded a "Pattern of Racketeering"**
In order to properly plead an NJRICO violation, Edgewood must include allegations establishing a "pattern of racketeering." N.J .S.A. 2C:41–2c. Unlike the federal statute, NJRICO, as interpreted by the New Jersey courts, does not place as much emphasis on "continuity," but instead, focuses on the "relatedness" of the activity. *Metz v. United Counties Bancorp,* 61 F.Supp.2d 364, 373 (D.N.J.1999) (citing Ball, 141 N.J. at 166–69, 661 A.2d 251) The New Jersey Supreme Court, opining in Ball, interpreted NJRICO to include short-term patterns of racketeering activity:

> In the most likely setting, predicate incidents [acts] of racketeering conduct will occur sequentially over a period of time. New Jersey's legislative discussions, unlike Congress's, do not indicate a concern for reaching only long-term criminal activity. But short-term criminal activity, to be

covered, must encompass incidents of criminal conduct that are not disconnected or isolated. Incidents of racketeering that occur sequentially, to overcome any inference that they are totally disconnected or isolated, must exhibit some temporal connection or continuity over time.

*Ball,* 141 N.J. at 169, 661 A.2d 251.[9] More particularly, under N.J.S.A. 2C41–1(d), a "pattern of racketeering activity" requires:

> (1) Engaging in at least two incidents of racketeering conduct one of which shall have occurred after the effective date of this act and the last of which shall have occurred within 10 years (excluding any period of imprisonment) after a prior incident of racketeering activity; and,

> > (2) A showing that the incidents of racketeering activity embrace criminal conduct that has either the same or similar purposes, results, participants or victims or methods of commission or are otherwise interrelated by distinguishing characteristics and are not isolated incidents.

N.J.S.A. 2C41–1(d)(1); N.J.S.A. 2C41–1(d)(2).
Ford argues that Edgewood cannot plead a NJRICO claim, since the grounds of the claim are based upon a "single incident" involving a "single victim." (Ford's Opp. Br. at 15). Ford further argues that the nine-month time frame in which the alleged acts took place was too narrow to be actionable under NJRICO. *Id.* at 16, 661 A.2d 251. The statute, it argues, requires multiple incidents to more than one victim over a longer stretch of time, and in support of their position cite cases from this circuit interpreting federal RICO in that vain. *Id.* Thus, Ford and EQ argue that the Court should deny leave to amend this claim, since under federal law the claim would not survive a 12(b)(6) motion, as the pattern only involves at most a nine month period and there is no threat of continuing criminal activity. *Id.* at 17, 661 A.2d 251

**\*13** This Court takes note that where the New Jersey courts are silent on a particular part of NJRICO, courts will look to federal law. *Ball,* 141 N.J. at 156, 661 A.2d 251; *Interchange Bank v. Beglia,* 286 N.J.Super. 164, 177, 668 A.2d 465 (App.Div.1995). But, there is guidance from the New Jersey courts on this issue. In *Ball,* liberally interpreting NJRICO, established that the statute permits short-term patterns of activity, provided that the related incidents are not disconnected or isolated. *Ball,* 141 N.J.

Ford Motor Co. v. Edgewood Properties, Inc., Not Reported in F.Supp.2d (2009)

RICO Bus.Disp.Guide 11,632

at 169, 661 A.2d 251.[10] The remaining question is whether Edgewood sufficiently alleged predicate acts.

### 3. Edgewood Did Not Sufficiently Plead a Predicate Act Under N .J.S.A. 2C:21–16, Securing Execution of Documents by Deception.

Ford and EQ argue that Edgewood's amendment fails to allege the requisite predicate act of securing execution of documents by deception. More particularly, Ford and EQ contend that Edgewood cannot state a prima facie case under N.J.S.A. 2C:21–16 for deception, since the pleading only alleges that Ford and EQ "made misrepresentations as to their performance under the contract, not as to the contents of the contract." (Ford Opp. Br. at 18). They argue that the statute does not cover fraud in the inducement to sign, only with regard to the contents signed. *Id.*

Pursuant to N.J.S.A. 2C:21–16, a person "commits a crime in the fourth degree if by deception as to the contents of the instrument, he causes or induces another to execute any instrument affecting, purporting to affect, or likely to affect the pecuniary interest of any person." This Court finds that Edgewood has not sufficiently alleged in paragraph 263, a fraud-in-the-factum claim, pursuant to N .J.S.A. 2C:21–16. (Edgewood's Consolidated Amended Claims, at ¶ 263). In particular, paragraph 263 is under the heading "The Pattern of Racketeering Activity Violated N.J.S.A. 2C:21–16," and states: "[a]s described in paragraphs 111 through 133, which are incorporated herein, Ford, Alberici, EQ, J & L, Golder and/or Arcadis induced Edgewood to enter into the First Contract and the Second Contract, which detrimentally affected Edgewood's pecuniary interest ." (*Id.* at ¶ 263).

Moreover, paragraphs 111 through 133 pertain to "fraud in the inducement," which is not contemplated by N.J.S.A. 2C:21–16. (*Id .* at ¶ 111–133, 661 A.2d 251; see also, Comment 2 to N.J.S.A. 2C:21–16, which provides that the statute does not pertain to fraud in the inducement.) Thus, this Court finds that Edgewood has not properly plead a predicate act, securing execution of documents by deception. Furthermore, this Court finds that Edgewood has not pleaded with particularity that EQ committed a predicate act under N.J.S.A. 2C:21–16. The only reference to EQ is contained in ¶ 263, which is brief and conclusory, and as a result, does not conform to Rule 9(b). Therefore, the claim does not give EQ "fair notice ... and the grounds upon which it rests." *Twombly,* 127 S.Ct. at 1964.

### 4. Edgewood Properly Pleaded a Predicate Act that Ford Violated 2C:21–7(A)(d), Selling Adulterated or Mislabeled Commodities

*14 Ford contends that Edgewood failed to properly plead a violation under N.J.S.A. 2C:21–7A(d), because the concrete was not "adulterated." (Ford's Opp. Br. at 19). It contends that Edgewood must explain how the concrete varied from the standard composition of quality as provided by law. (*Id.*). This Court disagrees. Whether or not the concrete is adulterated is a factual conclusion, the veracity of which is to be fleshed out through discovery. Certainly, contaminated concrete is involved in this case.

N.J.S.A. 2C:21–7A(d) provides in relevant part, that it is unlawful to "sell[ ], offer[ ] or expose[ ] for sale adulterated or mislabeled commodities." Adulterated is defined as: "varying from the standard of composition or quality prescribed by or pursuant to any statute providing criminal penalties for such variance, or set by established commercial usage." *Id.*

Here, Edgewood claims that it sufficiently pleaded that the enterprise conspired to relieve itself of contaminated concrete through a series of contractual relationships in order to avoid the costs of proper disposal. (Edgewood's Consolidated Amended Claims, at ¶ 242–60). Edgewood further claims that there are several connected incidents of distributing contaminated concrete to various properties. (*Id.* at ¶ 60). Moreover, the victims involved are not only Edgewood, but also the owners of the properties, such as, 240 Princeton Avenue Associates and Preferred Real Estate Investments.

At first glance, distributions of concrete occurring over a nine-month period, as alleged in this case, even though involving multiple incidences, would implicate a pattern too short in duration, whereby a court would be inclined to dismiss the claim had it been applying the federal "continuity" standard, unless there is some indication of a "threat" of future criminal activity.[11] However, and in *Metz,* the District Court distinguished the NJRICO and federal RICO standards, illustrating that while "five or six" fraudulent communications over a short period of time would fail under the federal "continuity" standard, conversely, said communications would withstand a 12(b)(6) motion under the looser "relatedness" standard of NJRICO. *Metz,* 61 F.Supp.2d at 373.

On this basis, Edgewood makes a persuasive argument that there would have been a continuing threat of fraudulent activity under the federal standard, but for its discovery of the contamination which impeded the enterprise's flow. (Edgewood's Reply Brief, at 31). Neither Ford, EQ, nor Alberici present a case to this Court

Ford Motor Co. v. Edgewood Properties, Inc., Not Reported in F.Supp.2d (2009)

RICO Bus.Disp.Guide 11,632

showing that a requirement of "threat" of further criminal activity is necessary in cases involving racketeering incidents occurring over a period of less than one year under NJRICO. In its amended pleading, Edgewood also incorporated paragraphs 375–80, which identify the date, time, or place that the "adulterated" concrete was sold and to whom. (Edgewood's Consolidated Amended Claims, at ¶ 401). Additionally, Edgewood alleges that it was sold contaminated concrete both under the First and Second Contracts, and that Ford and opposing parties knew about the condition of the concrete, and that EQ was responsible, in part, for its distribution. (*Id.* at ¶¶ 110–133, 377, 379, 387). Requiring that Edgewood plead how the concrete morphed from a standard to "adulterated" condition would impose a burden not contemplated under notice pleading. It would in effect place Edgewood in a position of drawing scientifically-based conclusions which only can be obtained through expert proof, which is not required at this stage in the litigation.

**\*15** This Court finds that Edgewood's amended claim on this issue raises a right to relief above the speculative level. Therefore, based on the aforementioned, this Court finds that Edgewood satisfactorily plead a violation of N.J.S.A. 2C:21–7(A)(d), based on the NJRICO standard, since the statute contemplates allegations of incidents over short periods of time. *Ball,* 141 N.J. at 169, 661 A.2d 251.

**5. Edgewood Properly Pleaded Federal Mail and Wire Fraud Under 18 U.S.C. §§ 1341 and 1343, Respectively.**

Ford, Alberici and EQ contend that Edgewood has failed to adequately plead a predicate act of mail or wire fraud under 18 U.S.C. §§ 1341 and 1343. Pursuant to 18 U.S.C. §§ 1341 and 1343, the use of the mails and interstate wires for purposes of carrying out any scheme or artifice to defraud is prohibited. "A scheme or artifice to defraud need not be fraudulent on its face, but must involve some sort of fraudulent misrepresentation or omission reasonably calculated to deceive persons of ordinary prudence and comprehension." *Lum,* 361 F.3d at 233. (citations omitted). Under the heightened pleading standard of the rule, a plaintiff must plead "the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." (*Id.* at 223–24). The requirement may be satisfied by pleading the "date, time, or place" of the fraud, or some "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." (*Id.* at 224). A plaintiff "must also allege who

made a misrepresentation to whom and the general content of the misrepresentation." (*Id.*).

Improper use of the federal mail and wires are predicate offenses under federal RICO, 18 U.S.C. § 1961(1), and NJRICO, N.J.S.A. 2C:41–1(a)(2) (incorporating by reference federal list of racketeering activities). To allege mail or wire fraud, a plaintiff must describe: (1) the existence of a scheme to defraud, (2) the use of the mails or wires in furtherance of the fraudulent scheme, and (3) culpable participation by the defendants. *Emcore Corp.,* 102 F.Supp.2d at 245 (citing *U.S. v. Pearlstein,* 576 F.2d 531, 534 (3d Cir.1978) (other citations omitted). "To be part of the execution of [mail] fraud ... the use of the mails need not be an essential element of the scheme. It is sufficient for the mailing to be 'incident to an essential part of the scheme,' or 'a step in [the] plot.' " (*Id.* quoting *Schmuck,* 489 U.S. 705, 710–11, 109 S.Ct. 1443, 103 L.Ed.2d 734) (quotations omitted). Further, even "completely 'innocent' mailings" (those that contain no false information) can satisfy the mailing element. (*Id.* citing *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1415 (3d Cir.1991)) (other citations omitted). Therefore, "[a] scheme or artifice to defraud 'need not be fraudulent on its face, but must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension.' " (*Id.* quoting *Kehr Packages,* 926 F.2d at 1415) (quotations and other citations omitted).

**\*16** Here, Edgewood contends that it has sufficiently pleaded, pursuant to the heightened 9(b) standard, that the enterprise participated in a predicate act through the use of the mails and wires, including but not limited to, at least fifteen examples of communications allegedly made in furtherance of the fraud. While Ford admits that at least two of those fifteen communications may contain fraudulent statements, (Edgewood's Consolidated Amended Claims, at 274 (8, 10)), they contend that the totality of the communications do not describe fraudulent activity. (Ford's Opposition Brief, at 20). Instead, they argue that the communications concern the process of simply deconstructing the plant. (*Id.*). Discovery may well prove Ford correct. At this juncture, however, the Court only will endeavor to evaluate whether Edgewood's amendment would be futile. It is not.

To buttress this Court's position, the Third Circuit in Seville interpreted Rule 9(b) as requiring plaintiffs to plead with particularity the "circumstances" of the fraud so as to notify the defendants of their alleged misconduct. *Seville Industrial Machinery Corp. v. Southmost Machinery Corp.,* 742 F.2d 786, 791 (3d Cir.1984). The court explained that: "[i]t is certainly true that allegations

of "date, place, or time" fulfill these functions, but nothing in the rule requires them. *Id.* Plaintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Id.* The court further held that when applying Rule 9(b): "focusing exclusively on its 'particularity' language' is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules." *Id.*

Here, Edgewood has sufficiently pleaded the elements of use of the mails and wires in furtherance of the fraud. It alleged that the opposing parties formed an enterprise through the wires and mails, with the "intent to distribute contaminated concrete that they knew was contaminated" so as to avoid incurring costs of legally disposing of the concrete. (Edgewood's Consolidated Amended Claims, at ¶¶ 219; 351). Thus, this Court finds that Edgewood has sufficiently plead the existence of a scheme to defraud.

This brings the analysis to the heart of the controversy which surrounds Edgewood's allegations that several of the alleged enterprise's communications, approximately fifteen of them, were used in the ordinary course of business with the purpose of advancing and perpetuating the scheme to defraud Edgewood.[12] In *Kronfled,* the court decided that mail and wire fraud was adequately pleaded, despite the fact the pleading did not recount specific mailings or other communications.[13] *Kronfeld,* 638 F.Supp. at 1471. Here, the proposed amendments falls within the same category, with the exception of two amendments which mention "false statements." This Court finds that taken together these communications place the defendants on notice that they were aware that the concrete was contaminated, that it needed to be properly disposed, and that third parties would become involved.

**\*17** Hence, it is plausible to this Court to conclude that these communications, albeit for the most part could be prima facie benign, in context of the rest of the complaint, plead the "circumstances" of the fraud. The communications constitute the means by which the members of the enterprise informed each other as to the condition of the concrete, and are in fact alleged to be a "step in the plot to defraud." It will be up to Edgewood to prove at trial that these communications amount to something more than simply a process to decommission. *Darrick Enters. v. Mitsubishi Motors Corp.,* No. 05–4359(NLH), 2007 U.S. Dist. LEXIS 72956 at \* 71, 2007 WL 2893366 (Sept. 28, 2007). (citing *Seville:* "It is the function of discovery to fill in the details, and of trial to establish fully each element of the cause of action.")

Furthermore, as stated above, the allegations of the communications need not contain any misrepresentations under the heightened pleading standard. *Kehr Packages,* 926 F.2d 1406 at 1415. "Rather, 'innocent' mailings— ones that contain no false information—may supply the mailing element." *Id.* Here, while only two of the alleged communications reference "false statements," this Court finds that at minimum, the totality of the communications are plead as "incident" to an essential part of the fraudulent scheme. *Schmuck,* 489 U.S. at 711. In paragraph 408, Edgewood alleges that the:

> [C]onduct, acts and omissions of Ford, EQ, Alberici, J & L, Golder and Arcadis were an integral part of the overall pattern and practices described herein, including using the mails and wires of the United States in interstate commerce to profit from their scheme to defraud and to avoid the significant expenses of properly and lawfully handling, testing and/or disposing of the contaminated concrete.

(Edgewood's Consolidated Amended Claims, at ¶ 408). This portion of the pleading asserts the culpable participation of the defendants, thus placing them on notice of the alleged offenses. Therefore, this court finds that Edgewood sufficiently pleaded a predicate act of wire and mail fraud under Rule 9(b), and leave to amend is hereby granted. With respect to claim 247(7), leave is granted to Edgewood to correct any inaccuracy as to the proper recipient of a "fax."

### III. CONCLUSION

For the foregoing reasons, Edgewood's motion to amend is **GRANTED** with respect to its negligent misrepresentation against Ford, Ford Land, and EQ; its strict liability claim against Ford, and Ford Land, its civil conspiracy claim against EQ and Alberici; and in part, against Ford, Ford Land, Alberici and EQ on its NJRICO claim. The motion is **DENIED** with respect to the breach of contract and contribution claims.

**Parallel Citations**

RICO Bus.Disp.Guide 11,632

Ford Motor Co. v. Edgewood Properties, Inc., Not Reported in F.Supp.2d (2009)

RICO Bus.Disp.Guide 11,632

Footnotes

1    The Court will not consider whether an oral contract may be pleaded, since it is not pleaded as a count in Edgewood's Proposed
     Pleading.

2    This Court, of course, does not pass on the merits on the claim

3    Edgewood also filed a negligent misrepresentation claim against Alberici. However, Alberici does not object to the amendment
     and therefore the Court will not discuss it.

4    EQ argues that the use of "and/or" throughout the Count of negligent misrepresentation fails to give EQ fair notice of the claim.
     This court disagrees. Count VI of the Third Party Complaint sets forth additional facts to support the elements of negligent
     misrepresentation and incorporates by reference paragraphs 44 through 59 which describe the negotiations and misrepresentations
     made among Ford, Alberici, EQ, Golder and Arcadis regarding the quality of the concrete. In particular, paragraphs 69 and 70
     place EQ on notice that Dave Ciroli, who signed the Second Contract on behalf of EQ, was involved in the misrepresentations.

5    N.J. Stat. Ann. 58:10–23.11e2 provides: "At least 30 days prior to its agreement to any administrative or judicially approved
     settlement entered into pursuant to P.L.1976, c. 141 (C.58:10–23.11 et seq.), or at least 30 days prior to the issuance of any no
     further action letter issued pursuant to P.L.1993, c. 139 (C.58:10B–1 et seq.), on or after the effective date of P.L.2005, c. 348
     (C.58:10–23.11 e2 et al.), the Department of Environmental Protection shall publish in the New Jersey Register and on the New
     Jersey Department of Environmental Protection's website the name of the case, the names of the parties to the settlement or the no
     further action letter, as the case may be, the location of the property on which the discharge occurred, and a summary of the terms
     of the settlement or the no further action letter, including the amount of any monetary payments made or to be made. The
     Department of Environmental Protection shall provide written notice of the settlement or of the no further action letter, which shall
     include the information listed above, to all other parties in the case and to any other potentially responsible parties of whom the
     department has notice at the time of the publication."

6    N.J.S.A. § 58:10–23.11f(a)(2)(a) provides: "Whenever one or more dischargers or persons cleans up and removes a discharge of a
     hazardous substance, those dischargers and persons shall have a right of contribution against all other dischargers and persons in
     any way responsible for a discharged hazardous substance or other persons who are liable for the cost of the cleanup and removal
     of that discharge of a hazardous substance. In an action for contribution, the contribution plaintiffs need prove only that a discharge
     occurred for which the contribution defendant or defendants are liable pursuant to the provisions of subsection c. of section 8 of
     P.L.1976, c. 141 (C.58:10–23.11g), and the contribution defendant shall have only the defenses to liability available to parties
     pursuant to subsection d. of section 8 of P.L.1976, c. 141 (C.58:10–23.11g). In resolving contribution claims, a court may allocate
     the costs of cleanup and removal among liable parties using such equitable factors as the court determines are appropriate. Nothing
     in this subsection shall affect the right of any party to seek contribution pursuant to any other statute or under common law."

7    N.J.S.A. § 58:10–23.11f(a)(2)(b) provides: "A person who has discharged a hazardous substance or is in any way responsible for
     the discharge of a hazardous substance who has resolved his liability to the State for cleanup and removal costs, including the
     payment of compensation for damage to, or the loss of, natural resources, or for the restoration of natural resources, and (I) has
     received a no further action letter from the State, or (ii) has entered into an administrative or judicially approved settlement with
     the State, shall not be liable for claims for contribution regarding matters addressed in the settlement or the no further action letter,
     as the case may be. The settlement shall not release any other person from liability for cleanup and removal costs who is not a
     party to the settlement, but shall reduce the potential liability of any other discharger or person in any way responsible for a
     discharged hazardous substance at the site that is the subject of the no further action letter or the settlement by the amount of the no
     further action letter or the settlement."

8    *Hirsch v. Enright Refining Corp.,* 751 F.2d 628 (3d Cir.1984). *Enright* offered two rationales for its holding: the first being the
     plain text of the RICO statute, and the second being a more policy based argument, that Congress intended to limit liability to
     persons rather than potentially innocent enterprises that were victims of individuals' rackateering activity. The latter of these
     rationales was later rejected by the Supreme *Court in Sedima v. Imrex Co.,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346. 473
     U.S. 479, 105 S.Ct. 3292, 87 L.Ed.2d 346 (1985). However, the fulcrum of *Enright* has survived because the first rationale is
     mutually exclusive of the second. *See Jaguar Cars, Inc.,* 46 F.3d 258, 268 (3d Cir.1995) ("[w]e conclude that the essential holding
     of *Enright* remains undisturbed.")

9    With respect to the federal standard, the Supreme Court in *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 242, 109
     S.Ct. 2893, 106 L.Ed.2d 195 (1989), ruled: "Predicate acts extending over a few weeks or months and threatening no future
     criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. Often a RICO
     action will be brought before continuity can be established in this way. In such cases, liability depends on whether the threat of
     continuity is demonstrated." The Court opined that the way in which predicates establish a "threat" should be decided on a case-
     by-case basis. *Id.* Moreover, the Court ruled: "A RICO pattern may surely be established if the related predicates themselves

involve a distinct threat of long-term racketeering activity, either implicit or explicit." (*Id.*).

10    Further, this circuit, in discussing *H.J., Inc.*, noted that the Supreme Court vacated and remanded for reconsideration two cases upon which the district court relied, concluding that the "single injury, single victim scheme alleged by plaintiffs was legally insufficient to state a RICO pattern." *Swistock v. Jones*, 884 F.2d 755, 758 (3d Cir.1989) (noting that " '[C]ontinuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition") (citing the Supreme Court *H.J., Inc.*, 492 U.S. at 241.)

11    The Third Circuit held: "Thus, the length of time over which the predicate acts are alleged to have occurred is relevant, but the fact that the alleged predicates occurred over a short period is not dispositive. Even a closed-ended scheme of short duration, however, could involve a "distinct threat of long-term racketeering activity, either implicit or explicit." " *Swistock*, 884 F.2d at 757 (citations omitted).

12    The Third Circuit provided the following example: "[Defendants] represented to Seville that if the industrial machinery listed in Exhibits A and C were shipped on consignment to either Southmost, Tri–State, Gellman or Alfieri, that the industrial machinery would be resold, and that the purchase price paid by Seville for this equipment along with a 50% pro rata share of the profits resulting from resale would be distributed and paid back to Seville ... The district court also found that Seville's allegation that defendants had violated 18 U.S.C. §§ 2314 & 2315 (1982), prohibiting the interstate transportation and sale of stolen or fraudulently obtained goods worth more than $5,000, insufficient because although Seville alleged total damages amounting to $759,039, it failed to allege that the goods in question were worth more than $5,000." *Seville Industrial Machinery Corp.*, 742 F.2d 786 at n6. The court in *Seville* further explained that while it would have behooved the plaintiff to plead the $5,000.00 requirement with greater specificity, the district court read the allegation "too strictly." (*Id.*).

13    The court in *Kronfeld* opined: "Regarding the second element of mail and wire fraud, the complaint initially alleges: "In connection with the acts, conduct, combination and conspiracy alleged in this amended complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including telephone communications and the mails." (Amended Complaint para. 3). While no specifics are alleged about individual telephone or mail communications, the complaint sufficiently apprises defendants of the predicate offenses which form the basis of the civil RICO claim and satisfies the liberal pleading requirements of civil actions. *Kronfeld*, 638 F.Supp. at 1471.

---

End of Document                                    © 2013 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT H

Westlaw.

Not Reported in F.Supp.2d, 2007 WL 1071961 (D.N.J.)
**(Cite as: 2007 WL 1071961 (D.N.J.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
D. New Jersey.
Agnes THEODOSSIOU, Plaintiff,
v.
COMMERCE BANK, N.A., Defendant.

Civil Action No. 06-4137 (JEI).
April 5, 2007.

Barron, Baker & Posternock, LLP., by Thomas M.
Barron, Esq., Moorestown, NJ, for Plaintiff.

Brown & Connery, LLP., by Susan M. Leming, Esq.,
William M. Tambussi, Esq., Westmont, NJ, for Defendant.

## OPINION

IRENAS, Senior District Judge.

*1 Plaintiff Agnes Theodossiou ("Theodossiou")
filed a Complaint on August 31, 2006, against Defendant Commerce Bank ("Commerce") alleging
breach of contract (Count One) and violations of the
Family and Medical Leave Act (the "FMLA")(Count
Two), the New Jersey Family Leave Act (the
"NJFLA")(Count Three), and the New Jersey Law
Against Discrimination (Count Four).[FN1] Presently
before the Court is Commerce's motion to dismiss
Count One of the Complaint for failure to state a
claim upon which relief can be granted pursuant to
Fed.R.Civ.P. 12(b)(6) and Theodossiou's cross-
motion to amend the Complaint pursuant to
Fed.R.Civ.P. 15(a). For the reasons set forth below,
we will grant Commerce's motion to dismiss Count
One and deny Theodossiou's motion to amend the
Complaint.

> FN1. This Court has federal question juris-
> diction in this case pursuant to 28 U.S.C. §
> 1331, based upon the alleged violation of the
> FMLA.

## I.

Commerce hired Theodossiou on December 27,
2004, as Assistant Vice President, Mortgage Opera-

tions Manager. Theodossiou received Commerce's
Employee Handbook (the "Handbook") when she
was hired, which she signed to acknowledge receipt.
The Handbook states that its contents *"do not* create
a contract of any kind between Commerce and its
Employees" and that "[e]mployment with Com-
merce is terminable 'at will' " (emphasis in origi-
nal).

In a letter dated October 18, 2005, Theodossiou
was granted ninety days of maternity leave under
Commerce's Emergency Medical Leave ("EML")
program. [FN2] This letter indicated that her leave was
not a job-protected leave, [FN3] and would begin on
November 1, 2005, and expire on January 30, 2006.
When she went out on leave, she did not give a return
date. Theodossiou gave birth to her child on Decem-
ber 13, 2005. By a letter dated December 29, 2005,
Commerce notified Theodossiou that she was eligible
for medical leave under the FMLA as of December
27, 2005. The letter explained her rights under the
FMLA of, *inter alia*, "up to twelve (12) weeks of
unpaid leave in a twelve (12) month period" and of
reinstatement "to the same or an equivalent job with
the same pay, benefits, and terms and conditions of
employment on [her] return from an approved FMLA
leave." (Pl. Exh. 3(referencing 26 U.S.C. §§
2612(a)(1), 2614(a)(1))).

> FN2. Theodossiou was not yet eligible for
> leave under the FMLA or the NJFLA be-
> cause she had not been employed by Com-
> merce for twelve (12) months. *See* FMLA,
> 29 U.S.C. § 2611(2)(A)(I); NJFLA, N.J.
> REV. STAT. § 34:11B-3(e).

> FN3. Job-protected leave guarantees that an
> employee taking leave can return to the
> same or an equivalent position upon the ex-
> piration of the leave.

Theodossiou returned to work at Commerce on
May 1, 2006, prior to the expiration of her state and
federal leave. On June 6, 2006, Commerce notified
Theodossiou that she was being laid off and her posi-
tion eliminated pursuant to a reorganization plan.
Simultaneous with her lay off, Commerce posted an
opening for a new position, Assistant Manager of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1071961 (D.N.J.)
(Cite as: 2007 WL 1071961 (D.N.J.))

Operations. The position reported to the same person to whom Theodossiou had reported.

Theodossiou sent several emails to Robin J. Mancini ("Mancini"), an employee in Commerce's human resources department, requesting information on the newly posted job. Mancini repeatedly advised Theodossiou via email that Commerce was working on the job description. After finally receiving the job description and responsibilities, which were similar to those of her previous position, Theodossiou sent an email to Steven J. Greenberg, Senior Vice President and Manager of Residential Mortgages, and Brian Tyson ("Tyson"), Vice President and Director of Residential Mortgage Operations, expressing her desire to be considered for the new position. Several days later, Tyson sent Theodossiou an email informing her that the new position had been filled. On August 31, 2006, Theodossiou filed this Complaint.

**II.**

*2 Count One of the Complaint alleges breach of contract by Commerce. Theodossiou claims that the Handbook created an enforceable contract governing the terms and conditions of her employment with Commerce, and that Commerce breached this contract when it failed to return her to her previously held position or an equivalent one at the conclusion of her leave. Theodossiou further alleges that Commerce breached this contract when it failed to consider her for the new position created shortly after her termination.

Commerce first filed a motion to dismiss Count One of the Complaint. Theodossiou then filed a cross-motion to amend the Complaint to plead additional elements under the breach of contract count (Count One) to establish a promissory estoppel claim.

When considering a motion to dismiss, the Court must accept as true all well-pleaded allegations in the Complaint and view them in the light most favorable to the Plaintiff. *See Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974); *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994). The Court must accept as true any and all reasonable inferences derived from those facts. *See Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1384 (3d Cir.1994). In addition to the allegations of the Complaint, the Court may consider documents attached to or specifically referenced in the Com-

plaint, and matters of public record, without converting the motion to dismiss into one for summary judgment. *See Mele v. Federal Reserve Bank of N.Y.,* 359 F.3d 251, 255 n. 5 (3d Cir.2004); *Sentinel Trust Co. v. Universal Bonding Ins. Co.,* 316 F.3d 213, 216 (3d Cir.2003).

A plaintiff must establish that a valid contract between plaintiff and defendant exists to state a claim for breach of contract. *See Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc.,* 275 F.Supp.2d 543,566 (D.N.J.2003). Theodossiou cannot establish that the Handbook created a contract, and thus does not state a claim for breach of contract. Even though an employee handbook can alter an employee's at-will status by creating an implied contract between employer and employee, no such contract can be formed where the employee handbook contains a clear and prominent disclaimer. *See Woolley v. Hoffman-LaRoche, Inc.,* 99 N.J. 284, 297-98 (1985); *see also Marzano v. Computer Science Corp., Inc.,* 91 F.3d 497, 512 (3d Cir.1996).

An employee handbook disclaimer is clear if it states, "that there is no promise of any kind by the employer contained in the manual; [2] that regardless of what the manual says or provides, the employer promises nothing and remains free to change wages and all other working conditions without having to consult anyone and without anyone's agreement; and [3] that the employer continues to have the absolute power to fire anyone with or without good cause." *Nicosia v. Wakefern,* 643 A.2d 554, 560 (N.J.1994); *see also Woolley v. Hoffmann-La Roche, Inc.,* 491 A.2d 1257, 1271 (N.J.1985).

*3 Such language should appear in a prominent position, which generally means that it is displayed in a way to attract attention. *Nicosia,* 643 A.2d at 560. Although not required to satisfy the prominence requirement, language that is printed in bold and placed within a border has been held to satisfy this requirement. *See Gil v. Related Mgmt. Co.,* No. 06-2174, 2006 WL 2358574, at *7(D.N.J.2006); *Washington v. Cooper Hosp./Univ. Med. Ctr.,* No. 03-5791, 2005 WL 3299006, at *11 (D.N.J.2005).

Here, the Handbook contains clear disclaimers that are prominently displayed, indicating that no such implied contract has been created by its contents. Page four of the Handbook contains a one page

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1071961 (D.N.J.)
**(Cite as: 2007 WL 1071961 (D.N.J.))**

long "AT-WILL STATEMENT." This caption is printed in capital, bold letters at the top, center of the page. Just below it, in the same print but slightly smaller font, it reads "IMPORTANT NOTICE." In bold lettering, surrounded by a bold border, in the center of the page, the text reads, **"[e]mployment with Commerce is terminable 'at-will' ... "Commerce has the absolute power ... to terminate your [the employee's] employment, at any time, for any reason or no reason, with or without notice."** The text below this box reads, in part, that "Commerce does not make guarantees of any kind with respect to your [the employee's] continued employment," and that "Commerce is free to change its working conditions, policies and practices ... without having to consult anyone and without getting anyone's agreement."

These disclaimers are sufficient under the standards set forth in *Nicosia* and *Woolley*. The Handbook makes "no promise of any kind." Commerce retains the right to "change wages and all other working conditions without having to consult anyone and without anyone's agreement," and Commerce has "the absolute power to fire anyone with or without good cause." *Nicosia,* 643 A.2d at 560; *see also Woolley,* 491 A.2d at 1271. Commerce's disclaimers were sufficient to prevent the creation of any implied contractual rights.

In order to avoid dismissal of Count One, Theodossiou seeks to amend her Complaint to plead additional elements under the breach of contract claim to satisfy the requirements of promissory estoppel. Under Fed.R.Civ.P. 15(a), a party may amend the Complaint with leave of court, which "shall be freely given when justice so requires." The Court can deny a motion to amend for, *inter alia,* futility of amendment. *Forman v. Davis,* 371 U.S. 178, 182 (1962); *see also In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1434 (3d Cir.1997). An amendment is futile when "the Complaint, as amended, would fail to state a claim upon which relief could be granted." *Id.* at 1434.

The proposed amended Complaint alleges that the Handbook, along with the letters dated October 18 and December 29, 2005, "created a clear and definite promise by Commerce to Ms. Theodossiou that she would be reinstated to her job or its equivalent upon her return from maternity leave," and that "Ms. Theodossiou reasonably relied upon the leave poli-

cies ... to her detriment." The amended Complaint is futile because it still fails to state a claim upon which relief can be granted.

**\*4** A claim of promissory estoppel must demonstrate: "(1) a clear promise, (2) made with the expectation that the promisee will rely upon it, (3) reasonable reliance upon the promise, (4) which results in definite and substantial detriment." *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.,* 421 F.Supp.2d 831, 834 (D.N.J.2006). None of the three documents-the Handbook and the two 2005 letters-make a specific promise to Theodossiou upon which she could have reasonably relied. The Handbook clearly states, on page four, that ***"do[es] not*** create a contract" of any kind between Commerce and its Employees" (emphasis in original). The letter dated October 18, 2005, specifically states that Commerce's EML was "not a job-protected leave." The December 29, 2005, letter is simply a form letter containing boiler-plate language that Commerce routinely sends to employees who become eligible for medical leave under the FMLA. This letter simply notifies employees of their eligibility and summarizes the terms of the FMLA. None of these documents contained specific promises that Commerce made to Theodossiou upon which she could have reasonably relied.

**III.**

For the reasons set forth above, the Court finds that Plaintiff Theodossiou's Count One Breach of Contract claim fails to state a claim upon which relief can be granted and should therefore be dismissed. Additionally, the Court finds Plaintiff's cross-motion to amend the Complaint futile because an amended complaint would also fail to state a claim upon which relief can be granted. Accordingly, Defendant Commerce Bank's motion to dismiss will be granted and Plaintiff's cross-motion to amend will be denied. The Court will issue an appropriate order.

D.N.J.,2007.
Theodossiou v. Commerce Bank, N.A.
Not Reported in F.Supp.2d, 2007 WL 1071961 (D.N.J.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT I

Westlaw.

Not Reported in F.Supp.2d, 2006 WL 54342 (D.N.J.)
**(Cite as: 2006 WL 54342 (D.N.J.))**

C
Only the Westlaw citation is currently available.

United States District Court,
D. New Jersey.
Alexander Dimitri LASCARIS, an individual, f/k/a
Jim Dimitri Nikolakakos, Plaintiff,
v.
GRIFFIN INVESTIGATIONS, INC., a Nevada cor-
poration, CVI, LLC, a Nevada limited liability com-
pany, and Viisage Technology, Inc. Defendants.

No. Civ.A. 03-2172(JAG).
Jan. 10, 2006.

Alexander D. Lascaris, pro se.

John M. Donnelly, Mary Beth Clark, Levine, Staller,
Sklar, Chan, Brodsky & Donnelly, Atlantic City, NJ,
Christopher J. Dalton, Robert J. Stickles, Klett,
Rooney, Lieber & Schorling, PC, Newark, NJ, Peter
J. Kurshan, Chase, Kurshan, Herzfeld & Rubin, LLC,
Livingston, NJ, for Defendants.

*OPINION*
GREENAWAY, J.

*1 This matter comes before the Court on the
motion of Plaintiff Alexander Dimitri Lascaris, for-
merly known as Jim Dimitri Nikolakakos, for leave
to file a Second Amended Complaint, pursuant to
FED. R. CIV. P. 15(a), asserting claims under the
Fair Credit Reporting Act, 15 U.S.C. §§ 1681
("FCRA"), against remaining Defendants Griffin
Investigations, Inc. ("Griffin") and CVI, LLC
("CVI"), and a common law defamation claim
against Griffin. For the reasons set forth below, this
motion will be denied.

BACKGROUND
Plaintiff commenced this action with the filing of
a Complaint on May 13, 2003. On September 22,
2003, after Defendant Viisage Technology, Inc. an-
swered Plaintiff's initial Complaint, Plaintiff filed a
First Amended Complaint. [FN1]

FN1. Defendant Viisage filed and served an
Answer to the Complaint on or about July 8,

2003. Plaintiff cross-moved for leave to file
an Amended Complaint against Defendant
Viisage. Defendant Viisage filed no papers
in opposition to the cross-motion.

Plaintiff's First Amended Complaint alleged vio-
lations of the FCRA, the New Jersey Fair Credit Re-
porting Act ("NJFCRA"), N.J. STAT. ANN.. §
56:11-28 *et seq.* (West 1997), and common law
claims of defamation, invasion of privacy and emo-
tional distress. In January and March of 2004, Defen-
dants Viisage Technology, Inc., CVI, LLC, and Grif-
fin Investigations, Inc., moved to dismiss Plaintiff's
First Amended Complaint, pursuant to FED. R. CIV.
P. 12(b)(6). On November 22, 2004, this Court held
oral argument on those motions and, on December
16, 2004, granted Defendants' motions to dismiss
Plaintiff's claims under the FCRA and the NJFCRA
without prejudice. On December 16, 2004, Plaintiff
voluntarily withdrew his claims alleging intentional
infliction of emotional distress and invasion of pri-
vacy, pursuant to FED. R. CIV. P. 41(a). No counts
in this action remain against Defendant Viisage, and
there are no allegations raised against Defendant
Viisage in the proposed Second Amended Complaint.

On January 14, 2005, Defendant Griffin an-
swered the defamation claim in the First Amended
Complaint. Plaintiff then appealed to the Court by
letter, requesting permission to file a Second
Amended Complaint.

In the proposed Second Amended Complaint,
Plaintiff seeks 1) to reinstate claims that Defendants
Griffin and CVI are consumer reporting agencies and
that their reports are consumer reports under the
FCRA and 2) to amend the defamation claim asserted
against Defendant Griffin.

LEGAL STANDARD
Pursuant to FED. R. CIV. P. 15(a), once a re-
sponse to a party's pleading is served, that pleading
may be amended only by leave of court or by written
consent of the adverse party. Rule 15(a) provides that
leave to amend a pleading "shall be freely given
when justice so requires." FED. R. CIV. P. 15(a). A
general presumption exists in favor of allowing a
party to amend its pleadings. *See Boileau v. Bethle-*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 54342 (D.N.J.)
(Cite as: 2006 WL 54342 (D.N.J.))

hem Steel Corp., 730 F.2d 929, 938 (3d Cir.), cert. denied, 469 U.S. 871, 105 S.Ct. 221, 83 L.Ed.2d 150 (1984) (citing Forman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)). Leave to amend a complaint should be granted freely in the absence of undue delay or bad faith on the part of the movant as long as the amendment would not be futile and the opposing party would not suffer undue prejudice. See Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); Adams v. Gould Inc., 739 F.2d 858, 864 (3d Cir.1984), cert. denied, 469 U.S. 1122, 105 S.Ct. 806, 83 L.Ed.2d 799 (1985). "[A] refusal of a motion for leave to amend must be justified." Riley v. Taylor, 62 F.3d 86, 90 (3d Cir.1995).

*2 The Third Circuit has identified the following as permissible justifications: "(1) undue delay; (2) bad faith or dilatory motive; (3) undue prejudice to the opposition; (4) repeated failures to correct deficiencies with previous amendments; and (5) futility of the amendment." Id. at 90 (citing Conley v. Gibson, 355 U.S. 41, 48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "Amendment of the complaint is futile if the amendment will not cure the deficiency in the original complaint or if the amended complaint cannot withstand a renewed motion to dismiss." Jablonski v. Pan American World Airways, Inc., 863 F.2d 289, 292 (3d Cir.1988). See also Lake v. Arnold, 232 F.3d 360, 373 (3d Cir.2000).

DISCUSSION

Plaintiff's proposed Second Amended Complaint states two counts. Plaintiff reasserts claims against Defendants Griffin and CVI under the FCRA. (Sec. Am. Compl. ¶¶ 20-22; 28-31; 35-36.) Plaintiff also supplements his allegation of defamation against Defendant Griffin. (Sec. Am. Compl. ¶¶ 20-22; 28-31; 35-36; 93; 95-97.)

I. Amending the FCRA Claims

A. Applicability of the FCRA

Plaintiff seeks to re-introduce claims that this Court dismissed in its December 2, 2004 Opinion ("December Opinion"), which discussed at length the inapplicability of the FCRA to the facts alleged by Plaintiff. In that Opinion, this Court held that Plaintiff failed to state any valid claim for relief under the FCRA. Neither the FCRA nor the basic factual allegations have changed since that Opinion was issued,

and this Court will not repeat the December Opinion here.

Having conducted limited discovery, Plaintiff now seeks leave to file the Second Amended Complaint, presenting new allegations regarding how Plaintiff and associates, who were pejoratively referred to as "the Greeks," were mistreated and accused of using "palm-sized" computers and having a "small mirror" on the bill of baseball caps worn to commemorate the 1998 Superbowl championship. (Sec.Am.Compl.¶¶ 67-70.)

Plaintiff also now contends that casinos are lending agencies because "[t]he vast majority of Subscribing Casinos [FN2] routinely lend money to their customers in the form of chips." (Sec.Am.Compl.¶¶ 47.) Plaintiff argues that casinos extend credit to players in the course of their participation in games at the casinos. Plaintiff also alleges that players who are listed in Defendants' reports are disadvantaged when they seek to obtain credit from casinos. Plaintiff claims that the false accusations and allegations of criminal behavior and criminal records perpetrated in Defendants' reports harm such players' ability to obtain credit from casinos. Plaintiff concedes that "[a] casino's concept of 'creditworthiness' is different from a bank's concept of 'creditworthiness.' " (Sec.Am.Compl.¶ 48.)

FN2. The Second Amended Complaint defines "Subscribing Casinos" as those casinos that subscribe to Defendants' reports.

Plaintiff's revised approach does not materially alter this Court's analysis, as explained in the December Opinion. This Court again finds that Plaintiff's proposed Second Amended Complaint fails to state a claim that Defendants are consumer reporting agencies under the statute. Moreover, Plaintiff has failed to state a claim under the FCRA because he still has not alleged that a casino denied him credit or employment.

*3 There are no new factual allegations nor a new and valid legal predicate underlying Plaintiff's claims in the proposed Second Amended Complaint. The proposed Second Amended Complaint does not allege facts that state a valid claim under the FCRA. Rather, Plaintiff seeks an opportunity to re-litigate issues this Court settled in the December Opinion.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 54342 (D.N.J.)
**(Cite as: 2006 WL 54342 (D.N.J.))**

Because this Court finds the claims in the proposed Second Amended Complaint bear the same deficiencies as the corresponding claims in the First Amended Complaint, the claims asserted under the FCRA in the proposed Second Amended Complaint fail to state a valid claim under the statute. The proposed Second Amended Complaint could not withstand a renewed motion to dismiss. Permitting Plaintiff to amend the Complaint as proffered would be futile, and therefore, this Court denies Plaintiff's motion for leave to file a Second Amended Complaint.

While Plaintiff is a pro se litigant, and courts tend to be lenient in permitting pro se litigants to amend complaints, Plaintiff is also a lawyer admitted to practice in New York. In addition, Plaintiff has filed two complaints in this action and the proposed Second Amended Complaint would be the third complaint. Permitting Plaintiff three complaints results in undue prejudice to the opposition. Because amendment is futile, and because Plaintiff has not shown that amendment will allow him to correct the fatal deficiencies in his pleadings, and because of the prejudice Defendants will suffer if the Second Amended Complaint is permitted, this Court denies Plaintiff's motion for leave to file a Second Amended Complaint.

B. The Case or Controversy Requirement

In addition, Plaintiff's motion to amend must be denied because the proposed Second Amended Complaint continues to fail to present a justiciable case or controversy. As this Court explained in the December Opinion, even if Plaintiff's allegations fell within the purview of the FCRA, Plaintiff's proposed Second Amended Complaint still alleges a hypothetical controversy rather than one that is actual and justiciable. Plaintiff has alleged nothing new in the amendments which, if true, shows an actual injury related to casino credit or employment.

Ripeness doctrine allows courts to determine whether a party has brought an action prematurely and counsels abstention until such time as a dispute is sufficiently concrete to satisfy the constitutional and prudential requirements for resolution in federal court. In determining whether a case is ripe, courts "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." _Abbott Labs. v. Gardner,_ 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681

(1967).

In the December Opinion, this Court found that Plaintiff failed to establish an actual case or controversy because no injury had yet occurred. Plaintiff now argues that precedent supports finding a violation under the FCRA even if he has not applied for, or been denied, credit or employment. Plaintiff claims that the issue is "not how was the information used specifically with respect to the plaintiff', but rather "how [the information] is expected to be used or generally used or why is it collected to be used?" (Hr'g Tr. 21.) Plaintiff further argues that it is "the fact of [Defendants] having compiled [the information]" to facilitate credit decisions by casinos that renders it subject to the FCRA. This weak attempt at an end run around the case or controversy requirement cannot succeed.

*4 Without an injury in fact, Plaintiff has failed to show a justiciable case or controversy. "Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an 'injury in fact'-an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." _Lujan v. Defenders of Wildlife,_ 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal citations omitted). In the proposed Second Amended Complaint, Plaintiff alleges injuries to his credit and employment that are conjectural, not actual.

Plaintiff alleges no actual harm to his credit or employment resulting from Defendants' reports. In fact, Plaintiff could never apply for employment in a casino in New Jersey because he is neither a resident of the state of New Jersey nor a United States citizen. N.J.S.A. § 5:12-89(b)(4), 90(b).

Plaintiff's proposed Second Amended Complaint does not state an injury in fact and, on that basis alone, could not withstand a motion to dismiss. As such, it is futile to grant leave to amend.

II. Amending the Defamation Claims

Plaintiff also seeks to amend his claim of defamation asserted against Defendant Griffin. Plaintiff's proposed amendment generally seeks to add more details to the allegations and to make clear the circumstances giving rise to the allegations that Defen-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 54342 (D.N.J.)
**(Cite as: 2006 WL 54342 (D.N.J.))**

dant Griffin's reports contained information that is actionable.

This Court finds that the Plaintiff's claim as stated in the First Amended Complaint sets forth the allegation in its basic terms. Plaintiff's proposed amendments seek to add color in a manner that does not bolster pleading deficiencies, but add detail ferreted out during the discovery process. The addition of such detail does not materially alter this claim. The proposed amendments to the defamation claim are unnecessary, and permitting a plaintiff to amend the complaint to reflect the progress of discovery is contrary to the efficient administration of justice. Plaintiff will have ample opportunity to place on the record whatever additional information has been obtained through discovery that supports a judgment in Plaintiff's favor.

Defendant Griffin asserts numerous defenses against Plaintiff's motion to amend the defamation claim. This Court need not review the merits of these affirmative defenses in the resolution of this motion for leave to amend the complaint.

Plaintiff's motion for leave to amend the defamation claim against Defendant Griffin will be denied.

## CONCLUSION

For the reasons stated above, this Court concludes that further amendment of Plaintiff's First Amended Complaint is futile, unnecessary, and would result in prejudice to the opposition. Plaintiff's motion for leave to file a Second Amended Complaint is denied.

D.N.J.,2006.
Lascaris v. Griffin Investigations, Inc.
Not Reported in F.Supp.2d, 2006 WL 54342 (D.N.J.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT J





Cited
As of: Jan 07, 2013

THOMAS S. SCHMELZLE, Plaintiff, v. UNUM LIFE INSURANCE COMPANY
OF AMERICA, et al., Defendants.

Civil No. 08-0734 (AET)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

*2008 U.S. Dist. LEXIS 63627; 44 Employee Benefits Cas. (BNA) 2637*

July 31, 2008, Decided
July 31, 2008, Filed

**NOTICE:**   NOT FOR PUBLICATION

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants, an employer and a life insurance company, filed a motion to dismiss plaintiff employee's complaint pursuant to *Fed. R. Civ. P. 12(b)(6)*, asserting that the employee's state law claims against them failed because they were preempted by the enforcement and remedial scheme set forth by the Employee Retirement Income Security Act of 1974 (ERISA), *29 U.S.C.S. § 1001 et seq.*

**OVERVIEW:** The court found that the life insurance policy at issue was governed by ERISA, *29 U.S.C.S. § 1002(1)*, as defendants provided dependent life insurance coverage to eligible participating employees and their dependents, and the policy set forth the intended benefits, permitted a covered employee to name beneficiaries, explained that the source of financing was paid for either by the employer or the participant in the plan, and outlined procedures for claiming and receiving benefits. The court found that the employee's claims of breach of

contract, and breach of implied covenant of good faith and fair dealing, alleged to be contained in the contract, were brought as a challenge to defendants' denial of life insurance benefits. Thus, those claims related to an employee benefit plan governed by ERISA and were preempted under *29 U.S.C.S. § 1144(a)*. The employee's claims that defendants acted negligently and that the company breached its fiduciary duty were also preempted as they related to the denial of benefits by an ERISA plan. The employee's fraud claims were also preempted as they challenged defendants' denial of benefits and would require an examination of the contours of the plan.

**OUTCOME:** The court granted defendants' motion to dismiss and granted the employee leave to amend his complaint.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*

2008 U.S. Dist. LEXIS 63627, *; 44 Employee Benefits Cas. (BNA) 2637

[HN1] In deciding a motion to dismiss under *Fed. R. Civ. P. 12(b)(6)*, all allegations in the complaint must be accepted as true and viewed in the light most favorable to the plaintiff. The court need not, however, credit a plaintiff's "bald assertions" or "legal conclusions." A court may dismiss a complaint if it appears that a plaintiff has not pled enough facts to state a claim to relief that is plausible on its face. In addition to the complaint, a court may consider material integral to or explicitly relied upon in the complaint without converting a motion to dismiss into one for summary judgment.

***Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Federal Preemption > Applicability***

[HN2] Actions to recover benefits from an Employee Retirement Income Security Act of 1974 plan are considered "federal in character," under the notion that, with respect to some areas of the law, Congress may so completely preempt a particular area that even civil complaints purporting only to raise state law claims would be preempted.

***Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Federal Preemption > Applicability***

[HN3] Claims falling within the scope of the Employee Retirement Income Security Act of 1974's civil enforcement provisions, including actions to recover benefits or enforce rights under a plan, are completely preempted.

***Pensions & Benefits Law > Employee Benefit Plans > Welfare Benefit Plans***

[HN4] *29 U.S.C.S. § 1002(1)* defines "employee welfare benefits plans" as any plan or fund established by an employer or employee organization or the purpose of providing for its participants or beneficiaries, through the purchase of insurance or otherwise, benefits in the event of sickness, accident, disability, or death. In order for a document, or oral communication, to be considered an employee welfare benefits plan within the meaning of the Employee Retirement Income Security Act of 1974, a court must determine whether from the surrounding circumstances a reasonable person could ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits.

***Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Federal Preemption > State Laws***

[HN5] Section 514(a) of the Employee Retirement Income Security Act of 1974 (ERISA) provides that ERISA shall supersede any and all state laws insofar as they relate to any employee benefit plan governed by ERISA. *29 U.S.C.S. § 1144(a)*. Claims that merely attack the quality of benefits of a plan do not fall within the scope of ERISA's enforcement provisions and are not completely preempted, whereas claims challenging the quantum of benefits due under an ERISA-regulated plan are completely preempted.

**COUNSEL:** [*1] For THOMAS E. SCHMELZLE, Plaintiff: JAMES JOSEPH ADDONIZIO, LEAD ATTORNEY, RUDNICK, ADDONIZIO, PAPPA & COMER, PC, HAZLET, NJ.

For UNUM LIFE INSURANCE COMPANY OF AMERICA, Defendant: STEVEN P. DEL MAURO, LEAD ATTORNEY, MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP, Newark, NJ; JOSEPH RYAN MCCARTHY, MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP, MORRISTOWN, NJ.

For AKZO NOBEL CHEMICALS, INC., Defendant: JASON ALEX STORIPAN, LEAD ATTORNEY, FISHER & PHILLIPS, LLP, MURRAY HILL, NJ.

**JUDGES:** ANNE E. THOMPSON, U.S.D.J.

**OPINION BY:** ANNE E. THOMPSON

**OPINION**

***MEMORANDUM & ORDER***

*THOMPSON, U.S.D.J.*

This matter is before the Court upon Defendants Unum Life Insurance Company of America's ("Unum") and Azko Nobel Chemicals, Inc.'s ("Azko") Motions to Dismiss Plaintiff Thomas S. Schmelzle's Complaint Pursuant to *Fed. R. Civ. P. 12(b)(6)*. The Court has decided these Motions based upon the submissions of the parties and without oral argument pursuant to *Fed. R. Civ. P. 78*. For the reasons set forth below, Defendants' Motions are granted.

2008 U.S. Dist. LEXIS 63627, *1; 44 Employee Benefits Cas. (BNA) 2637

## BACKGROUND

Plaintiff Schmelzle is a New Jersey resident who was hired by Defendant Azko in 2002. (Compl., P 1.) Defendant Azko is a Delaware corporation, with its principal place of business located in Illinois. [*2] (Def. Unum's Notice of Removal, P 9.) Defendant Unum has its principal place of business, and is incorporated, in Maine. (*Id.*, P8.) Defendant Unum provided dependent life insurance coverage to Defendant Azko's employees, which was paid for by employees through a payroll deduction that was organized and executed by Defendants Unum and Azko. (Compl., P 3.)

Following his hiring, Plaintiff became eligible to elect dependent life insurance coverage for his wife, JoAnn Schmelzle, on January 1, 2004, when Defendant Azko's life insurance policy with Defendant Unum became effective. (*Id.*, P 6.) Beginning November 3, 2004, Plaintiff elected dependent life insurance coverage for his wife, and was charged approximately $ 3.70 per week for the coverage, which was deducted from his pay. (*Id.*, PP 7-8.) Plaintiff's wife died on December 22, 2006. (*Id.*, P 3.) Upon his wife's death, Plaintiff filed claims with Defendant Unum to collect the life insurance policy proceeds, but Defendant Unum refused to pay benefits. (*Id.*, P 10.) Plaintiff alleges that Defendants failed to pay the life insurance policy proceeds, approximately $ 80,000, because Plaintiff had failed to provide "evidence of insurability" on [*3] his wife's behalf when he elected dependent coverage. Plaintiff claims he was never told about this requirement. (*Id.*, P 19.)

On December 7, 2007, Plaintiff filed an action in the Superior Court, Middlesex County, alleging the following state causes of action against Defendants: (1) breach of the insurance contract; (2) conspiracy to commit fraud; (3) negligence; (4) breach of implied covenant of good faith and fair dealing of the insurance contract; (5) fraud in the inducement; and (6) breach of fiduciary duty, pleaded against Defendant Azko only. Defendants were served with the summons and Complaint on January 14, 2008. On February 11, 2008, Defendants filed a Notice of Removal to the District of New Jersey, with jurisdiction premised on the parties' diversity of citizenship. Defendants now move to dismiss Plaintiff's Complaint pursuant to *Fed. R. Civ. P. 12(b)(6)*, asserting that Plaintiff's state law claims fail because they are preempted by the enforcement and remedial scheme set forth by the Employee Retirement Income Security

Act of 1974 ("ERISA"), *29 U.S.C. § 1001 et seq.*

## DISCUSSION

Defendants argue that the life insurance policy at issue here is an employee welfare benefits plan [*4] that is governed by ERISA, and the federal statute completely preempts any state law causes of action that relate to an ERISA plan. Accordingly, Defendants ask the Court to dismiss Plaintiff's claims. Alternatively, Defendants ask the Court to limit Plaintiff's remedies to those available under ERISA, which is the payment of insurance benefits, and to strike Plaintiff's demand for a jury trial, because ERISA does not provide for jury trials. Plaintiff argues that the policy at issue is not governed by ERISA, and, because he did not allege that it was an ERISA plan in his Complaint, the Court should not determine whether the policy is one at this early stage of litigation. Further, Plaintiff contends that his state law claims would not be preempted by ERISA, because his claims are general causes of action that do not specifically apply to the governance of insurance plans.

### A. Standard of Review

[HN1] In deciding a motion to dismiss under *Rule 12(b)(6)*, all allegations in the complaint must be accepted as true and viewed in the light most favorable to the plaintiff. *See Morse v. Lower Merion Sch. Dist.*, *132 F.3d 902, 906 (3d Cir. 1997)*. The Court need not, however, credit a plaintiff's "bald [*5] assertions" or "legal conclusions." *Id.* A court may dismiss a complaint if it appears that a plaintiff has not pled "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007)*. In addition to the complaint, a court may consider material "integral to or explicitly relied upon in the complaint" without converting a motion to dismiss into one for summary judgment. *In re Rockefeller Ctr. Props., Inc. Sec. Litig., 184 F.3d 280, 287 (3d Cir. 1999)*.

As part of its Motion, Defendant Unum has included a copy of the life insurance policy it provided to Defendant Azko's employees. Because the insurance policy is "integral to or explicitly relied upon" in Plaintiffs' Complaint, the Court considers it as part of Defendant Unum's Motion to Dismiss.

### B. ERISA Preemption

2008 U.S. Dist. LEXIS 63627, *5; 44 Employee Benefits Cas. (BNA) 2637

Before the Court can determine whether ERISA preempts Plaintiff's state law claims, it must first decide whether the life insurance policy at issue is governed by ERISA. The Court disagrees with Plaintiff that, because he did not specifically plead that the life insurance policy was an ERISA plan, it should refrain from deciding whether ERISA applies to it until [*6] discovery on this issue occurs. [HN2] Actions to recover benefits from an ERISA plan are considered "federal in character," under the notion that, with respect to some areas of the law, "Congress may so completely pre-empt a particular area" that even civil complaints purporting only to raise state law claims, as is the case here, would be preempted. *Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 63-64, 107 S. Ct. 1542, 95 L. Ed. 2d 55 (1987)*; *see also Pryzbowski v. U.S. Healthcare, Inc., 245 F.3d 266, 271-72 (3d Cir. 2001)* (holding that [HN3] claims falling within the scope of ERISA's civil enforcement provisions, including actions to recover benefits or enforce rights under a plan, are completely preempted). Thus, because determination of whether Plaintiff's life insurance policy is governed by ERISA may result in prompt resolution of his state law claims, and it is not clear to the Court that discovery would inform the Court's analysis of the policy submitted by Defendant Unum, the Court will examine Plaintiff's life insurance policy to determine ERISA's applicability.

[HN4] *29 U.S.C. § 1002(1)* defines "employee welfare benefits plans" as any plan or fund established by an employer or employee organization "for the purpose of [*7] providing for its participants or beneficiaries, through the purchase of insurance or otherwise, (A) . . . benefits in the event of sickness, accident, disability, [or] death . . ." In order for a document, or oral communication, to be considered an employee welfare benefits plan within the meaning of ERISA, "a court must determine whether from the surrounding circumstances a reasonable person could ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Smith v. Hartford Ins. Group, 6 F.3d 131, 136 (3d Cir. 1993)*.

Here, the life insurance policy meets the test articulated in *Smith*. Plaintiff has alleged that the dependent life insurance coverage was provided by Defendants Azko and Unum to eligible participating employees and their dependents. The policy sets forth the intended benefits, as a multiple of a covered employee's earnings, payable upon the death of a covered employee

or dependent (McCarthy Cert., Ex. A at B@G-LIFE-1 to B@G-LIFE-2), permits a covered employee to name beneficiaries (*Id.,* LIFE-CLM-1 to LIFE-CLM-2), explains that the source of financing is paid for either by the employer, or the participant [*8] in the plan, depending on his employment status (*Id.,* B@G-LIFE-1 to B@G-LIFE-2), and outlines procedures for claiming and receiving benefits. (*Id.,* LIFE-CLM-1 to LIFE-CLM-3.)

Having determined that Plaintiff's life insurance policy is governed by ERISA, the Court next considers whether ERISA's civil enforcement scheme preempts any or all of Plaintiff's state claims. [HN5] *Section 514(a) of ERISA* provides that ERISA "shall supersede any and all State laws insofar as they . . . relate to any employee benefit plan" governed by ERISA. *29 U.S.C. § 1144(a)*. "[C]laims that merely attack the quality of benefits [of a plan] do not fall within the scope of [ERISA's] enforcement provisions and are not completely preempted, whereas claims challenging the quantum of benefits due under an ERISA-regulated plan are completely preempted . . . ." *Pryzbowski, 245 F.3d at 272*.

Here, the Court finds that Plaintiff's claims of breach of contract, and breach of implied covenant of good faith and fair dealing, alleged to be contained in the contract, are brought as a challenge to Defendants' denial of life insurance benefits. Thus, the Court finds that these claims relate to an employee benefit plan governed by ERISA [*9] and are preempted, and dismisses Counts One and Four. Similarly, in his third count, Plaintiff alleges that Defendants acted negligently when they failed to advise him that he needed to provide "evidence of insurability" for his wife before they would pay the proceeds on the life insurance policy. Plaintiff further alleges that Defendant Azko's failure to advise him "of conditions relating to the dependent coverage and never followed up to insure all conditions were met before the payroll deduction for the policy" constitutes a breach of fiduciary duty. The Court finds that these claims relate to the denial of benefits by an ERISA plan, and are preempted by ERISA. Therefore, Counts Three and Six are dismissed.

Plaintiff relies on *Finderne Management Co., Inc. V. Barrett, 355 N.J. Super. 170, 809 A.2d 842 (N.J. Super. App. Div. 2002)* in support of his argument that the second and fifth counts of his Complaint, for conspiracy to commit fraud, and fraud in the inducement, should not

2008 U.S. Dist. LEXIS 63627, *9; 44 Employee Benefits Cas. (BNA) 2637

be dismissed as preempted by ERISA. The *Finderne* court, however, held that the plaintiffs could proceed with their fraud claims against an insurance agent where the alleged misrepresentations, designed to induce plaintiffs to join [*10] the plan, involved the tax consequences of the plan, and would not require the court to examine "the particulars of an ERISA plan." *809 A.2d at 856.* Here, however, Plaintiff's fraud claims allege that Defendants induced his election of dependent life insurance coverage, and deducted premium payments from his pay, knowing that the life insurance policy was not in place because Plaintiff had not provided evidence of insurability. The Court finds that these claims, like the others that Plaintiff has alleged, challenge Defendants' denial of benefits allegedly owed to Plaintiff under the policy, and would require an examination of the contours of the plan. Thus, the Court finds that these claims are preempted by ERISA, and dismisses Counts Two and Five.

In his Opposition papers, Plaintiff asks that the Court deem his Complaint amended so as to assert the ERISA claim in the event that his state law claims are preempted. Defendants oppose this constructive amendment, and instead ask that Plaintiff be granted leave to amend his Complaint. The Court agrees with Defendants, and will not deem Plaintiff's Complaint to be so amended. However, the Court grants Plaintiff leave to amend his

Complaint [*11] to properly assert any ERISA claims he may have.

*CONCLUSION*

For the foregoing reasons, and for good cause shown,

IT IS on this 31st day of July, 2008,

ORDERED that Defendant Unum Life Insurance Company of America's Motion to Dismiss Plaintiff Thomas S. Schmelzle's Complaint Pursuant to *Fed. R. Civ. P. 12(b)(6)* [7] is GRANTED; and it is further

ORDERED that Defendant Azko Nobel Chemicals, Inc.'s Motion to Dismiss Plaintiff Thomas S. Schmelzle's Complaint Pursuant to *Fed. R. Civ. P. 12(b)(6)* [8] is GRANTED; and it is further

ORDERED that Plaintiff Thomas S. Schmelzle is granted leave to amend his Complaint if submitted within 15 days of this Order.

/s/ Anne E. Thompson

ANNE E. THOMPSON, U.S.D.J.